IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 28, 2008

Charles R. Fulbruge III
Clerk

No. 06-20763

GARY W GATES, JR; MELISSA GATES, Individually and as next friends to
Sarah Gates, Derodrick Gates, Travis Gates, Raquel Gates, Cynthia Gates,
Cassandra Gates, Timothy Gates, Andrew Gates, Alexis Gates, and Marcus
Gates; GARY WILTON GATES; GEORGE GATES; SCOTT GATES

Plaintiffs-Appellants

v.

TEXAS DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES,
Childrens Protective Services; THOMAS CHAPMOND; JERRY POLASEK;
AMY ODIN; SANDRA RUSSELL; LISA MATTHEWS; LAURA MILLER;
ERIKA DAVIS; SHERRECE HAYWOOD; LAURA RAMIREZ; FORT BEND
COUNTY; MILTON WRIGHT; SAM MILLSAP; ARTHUR CHAPMAN;
CARLOS CARRILLO; VIRGINIA SCHAEFER; KEN LEE; LLOYD
ROWLAND, Sergeant; JAMES CARLSON, Detective; SPILMAN, Detective

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before WIENER, DeMOSS, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

Before us is an appeal of a district court's decision to dismiss a family's claims against various governmental entities and employees who allegedly performed unconstitutional child abuse investigations. For the following reasons, we AFFIRM the judgment of the district court.

## I. FACTUAL BACKGROUND

Gary and Melissa Gates are the parents of thirteen children—two biological (Sarah and Will) and eleven adopted (George, Scott, Derodrick, Travis, Raquel, Cynthia, Cassandra, Timothy, Andrew, Alexis, and Marcus).[1] The Gateses believe that the Texas Department of Protective and Regulatory Services ("TDPRS")[2] and Fort Bend County ("Fort Bend"), along with employees of each, violated their constitutional rights when conducting several child abuse investigations of the Gates family.

A.    First Incident–February 11, 2000

Gary and Melissa adopted siblings Scott, Derodrick, Travis, and Raquel through TDPRS in 1997. Travis had a severe attachment disorder and an eating disorder that caused him to steal and gorge on food. Travis's teachers at his school in the Lamar Consolidated Independent School District ("LCISD") were aware of this problem and had to monitor Travis closely, as he would frequently steal food from students and teachers. Indeed, Travis's school files contain documentation of dozens of instances of food theft by Travis. In addition to that, Gary and LCISD disagreed about how to best educate Travis overall, and the dispute culminated in a "heated" Admission, Review, and Dismissal meeting between Gary and LCISD personnel on February 10, 2000.

Also on February 10, Gary and Melissa discovered that Travis, who was ten years old at the time, had stolen food from the kitchen, including two boxes of fig bars that he ate in the attic. He had also played with matches while in the attic. In an attempt to make Travis understand the seriousness of his conduct, Gary put the fig bar wrappers in a baggie and pinned it to Travis's shirt. Gary said it was the first time Travis had shown genuine remorse for his actions, so

---

[1] Because of the number of Gateses involved in this case, we will refer to each member of the family by his or her first name.

[2] TDPRS is now known as the Texas Department of Family and Protective Services.

Gary decided to make Travis wear the baggie filled with wrappers to school on February 11. Gary included a note in the baggie that explained his reason for the punishment and invited LCISD to contact him if it had any questions.

At 8:31 a.m. on February 11, Tiffany Bezdek ("Bezdek"), a Statewide Intake Specialist with TDPRS, received a call on the Abuse/Neglect Hotline from an individual at LCISD ("the reporter") regarding Travis. According to the Call Narrative, the reporter stated as follows:

- Travis had been forced by his father to wear food wrappers stapled to his clothes as a punishment for stealing food from home.

- Travis was not allowed to attend the Valentine's Day parties or eat any food from school.

- Travis had a severe emotional disturbance and eating disorder.

- Travis was in a strict setting at school because Gary would not treat him medically.

- Gary was "very religious and very controlling" and weighed Travis each day, forcing him to work off any extra pounds.

- Gary once punished Travis for stealing food by requiring him to move bricks from one pile to another.

- One year ago, Gary punished Travis for stealing food by handcuffing him to his bed for a day.

Based on this information, Bezdek classified the report as Priority 1. TDPRS is supposed to classify reports as Priority 1 when the reports "concern children who appear to face an immediate risk of abuse or neglect that could result in death or serious harm." 40 TEX. ADMIN. CODE § 700.505 (2007).[3] TDPRS must investigate Priority 1 reports within twenty-four hours. Id.

---

[3] Bezdek stated that the factors she considered in designating the report as Priority 1 were accessibility of the alleged perpetrator to the child, the fact that the child was unprotected, hostility expressed toward the child, inappropriate discipline, the fact that the alleged abuse/neglect was occurring now, yelling at the child, and behavior of the child that was detrimental to himself.

Because of the Priority 1 designation, TDPRS dispatched Defendant-Appellee Erika Davis ("Davis"), a TDPRS investigator, to interview Travis at his school. Upon arriving, Davis noticed that Travis "had a mark on his hand and a mark on his face somewhere." Davis decided to take Travis to the Child Advocacy Center ("the CAC") for a videotaped interview. The CAC was established pursuant to Chapter 264, Subchapter E, of the Texas Family Code. The goal of the CAC is to coordinate child abuse investigations among the various branches of government, including TDPRS, county law enforcement, and the district attorney, so that children will not experience the trauma of multiple investigations from the different governmental entities. Thus, for example, a CAC worker may conduct one interview of a child that can then be used by any branch of government, rather than each entity conducting its own interview.

Upon arrival at the CAC, Travis was interviewed by CAC worker Bonnie Martin ("Martin"). Travis told her that, following Gary's discovery that Travis had been stealing food, Gary pushed and kicked Travis, made Travis sit in the "chair position" with his back against the wall, and run up and down stairs until his legs hurt. Travis further stated that Gary's punishments in the past included drinking "throw up" medicine, running, and moving bricks. Travis also said he had been spanked with a board before.

Prior to Travis's interview with Martin, Davis learned that Travis had twelve other siblings. Davis informed her supervisors at TDPRS of this fact, and Jerry Polasek ("Polasek"), a TDPRS supervisor, sent TDPRS employees Amy Odin ("Odin") and Sherrece Haywood ("Haywood"), along with TDPRS trainees Lisa Matthews ("Matthews") and Laura Ramirez ("Ramirez"), to interview Will, George, and Scott at their schools. Polasek, Odin, Haywood, Matthews, and Ramirez are all Defendants-Appellees in this action.

According to Will, George, and Scott, Gary was the disciplinarian in the family. His punishments included requiring the children to sit in the chair

position against a wall (sometimes with weights in their laps), move boards and bricks around the driveway, and run (both for punishment and for exercise). The smaller children were spanked with a belt. Will and Scott stated that Gary had handcuffed Travis to his bed in the past to keep him from stealing food. Scott also stated that Gary pushed Travis down when he found out about Travis stealing the fig bars. After reporting this information to their TDPRS supervisors, Odin, Haywood, Matthews, and Ramirez went to lunch.

At approximately 1:30 p.m., Davis took Travis from the CAC to the TDPRS offices. She then called Gary to inform him that TDPRS had interviewed Travis and to request permission to interview his other children. Gary denied permission to interview his children and arrived at the TDPRS offices ten minutes later to discuss the matter. TDPRS did not tell him that Travis was in the building.

In the meantime, Polasek called Odin, Haywood, Matthews, and Ramirez while they were at lunch and told them to go to the Gateses' home and interview the remaining children. Before arriving at the Gateses' home, Odin called for non-emergency support from the Fort Bend Sheriff's Department. Deputies Carlos Carrillo ("Carrillo") and Virginia Schaefer ("Schaefer"), who are Defendants-Appellees, responded to the request. The six of them arrived at the house between 3:00 and 3:30, right before the children came home from school. The Gateses' housekeeper Nermi Menjivar ("Menjivar") answered the door. She spoke only Spanish, which Carrillo and Ramirez also spoke.

Whether Menjivar consented to the entry of the individual defendants into the Gateses' house is the subject of some debate between the parties. Ramirez, Odin, and Haywood all remember that Menjivar let them into the house, but they do not remember what anyone said during the conversation. Carrillo believes he would have remembered if Menjivar had refused to let them in, and he does not recall that happening. Schaefer and Matthews do not remember

5

anything about the conversation. According to Menjivar, someone at the door told her that they wanted to speak with the children. She told them that Gary and Melissa were not home but that Melissa would be back between 4:00 and 4:30. Menjivar testified at her deposition that the TDPRS employees and Fort Bend deputies did not ask for permission to enter the house and that she did not intend for them to enter the house; however, she admits that she never told them that they could not enter the house. She also stated at her deposition that she told the TDPRS employees and Fort Bend deputies that "they would be able to speak with [the children]."

Within minutes, the Gates children arrived home by school bus, and Menjivar motioned them to come quickly into the house and told Derodrick to call his father. It appears that the TDPRS employees and Fort Bend deputies entered the house with the children and began the interview process. Once the TDPRS employees had gained entry to the house, the Fort Bend deputies left. The time spent at the front door took less than ten minutes.

While at the TDPRS offices, Gary received a call from Derodrick telling him that TDPRS employees were at their home and asking questions. Gary immediately returned to his house. Again, the parties disagree about what happened next. Gary claims he ordered the TDPRS employees to leave and that Odin told him they would remove his children if he did not cooperate. Matthews does not remember anything except Gary asking them to write their names down on a piece of paper. Haywood recalls that Gary was upset, and Ramirez remembers Gary yelling a lot and locking the front door so they could not leave. One of the TDPRS employees called the Fort Bend Sheriff's Department, prompting Carrillo, Schaefer, and Defendant-Appellee Deputy Arthur Chapman ("Chapman") to arrive. According to Gary, Chapman would not let Gary see his children and took Gary to the porch and threatened to put him in the squad car. Melissa arrived home around 5:15 p.m. and was not permitted to see the

children either. TDPRS employee Laurel Miller ("Miller"), also a Defendant-Appellee, later arrived in order to interview Melissa. Gary was eventually permitted in one room of the house, but he was still not allowed to be with his children. Around 6:00 p.m., TDPRS granted Gary and Melissa permission to order pizza for the children.

During the interviews with the children, TDPRS learned that Gary's punishments included sitting against the wall in the chair position, running, moving bricks and boards across the driveway, doing push-ups, and being spanked with a hand, belt, or board. Travis and Alexis had been given "throw-up" medicine (ipecac) for eating food they should not have eaten, and children were required to skip their next meal if they stole food. On occasion, Gary taped newspaper around a child's hands to keep him or her from stealing food.

Timothy stated that Gary threw the older children against the wall and that "dad hurts Travis and the big kids." Timothy also stated that he was afraid of his father because "he hurts them." Cynthia stated that after Gary found out about Travis stealing food, he kicked out Travis's chair while Travis was sitting on it, causing Travis to hit his head on the floor; Gary then hit Travis, kicked him in the stomach, and pushed him into a wall. Marcus corroborated this story. Cynthia also stated that Gary had hit Cassandra and Andrew the previous day and that she is scared to live at home because her dad gets so mad. Andy confirmed that he had been spanked the previous day and had a bruise on his leg as a result.

Further, according to a TDPRS employee, when Gary arrived home that day, he told his children, "These people want to talk to you, they think mom and dad are bad people." Timothy then responded, "Well dad you are bad, you slammed them [sic] up against the wall and made his head bleed." Alexis and Marcus agreed with Timothy.

Based on the reports and interviews,[4] Polasek and Defendant-Appellee Sandra Russell ("Russell"), who were TDPRS supervisors operating offsite, made the decision to remove the children from the home that evening. Later that evening, the Fort Bend County "jail wagon" arrived with Sergeant Sam Millsap ("Millsap"), Deputy Ken Lee ("Lee"), and Deputy Scott Pagel ("Pagel"). Millsap and Lee are Defendants-Appellees in this case. All of the children were loaded into the wagon and taken to the CAC, where they were further interviewed and eventually sent to foster homes. At 8:30 p.m., Davis removed Will from his high school dance and took him to the CAC. The Gateses were given a form notice that their children were being removed because the children's "physical health or safety was in immediate danger" and "there was no time to obtain an emergency court order before the removal."

On Monday, February 14, 2000, the next business day after the children were removed, TDPRS filed a Suit Affecting the Parent-Child Relationship. A hearing was conducted that same day, and the court ordered that the children be returned to their parents. TDPRS ultimately dismissed the suit seven months later. Gary and Melissa contended throughout the suit that they never abused their children. In support of their position, Gary and Melissa produced numerous affidavits from friends and professionals that commended the job Gary and Melissa were doing in raising a large number of children with different needs.

B.    Second Incident–January 25, 2001

---

[4] All of the TDPRS employees' hand-written notes of their interviews with the Gates children on February 11, 2000, were shredded pursuant to TDPRS policy after the information was entered into a computer. Thus, the only information regarding what was said by the Gates children comes from an affidavit signed by Davis that appears to be a compilation of the notes from Davis, Odin, Haywood, and Miller. The affidavit was created for use before the state court on February 14, 2000, when TDPRS attempted to justify its warrantless seizure of the Gates children. It is unclear to this court whether all of the information from the hand-written notes was included in the affidavit. While the Gates find fault with the shredding policy, the constitutionality of that practice is not before us today.

On January 25, 2001, an individual from LCISD anonymously reported to TDPRS that Alexis, who was in kindergarten at the time, had a one-inch bruise on her face. The individual further stated that Alexis told her teacher that Gary had given her the bruise but told the school nurse that her brother Derodrick gave her the bruise when he pushed her into a bed. TDPRS classified the report as Priority 1, and Polasek ordered TDPRS employee Lori Sterns ("Sterns") to remove Alexis from school and bring her to the CAC so TDPRS could conduct a videotaped interview. During the interview, Alexis stated that she received the bruise while wrestling with her brother Marcus. Alexis was then returned to her parents.

TDPRS asked Gary for permission to interview other members of the family, and Gary refused. In response, TDPRS filed a Petition for Orders in Aid of Investigation of a Report of Child Abuse in state district court in order to gain access to the children. The court held a hearing regarding the Petition on February 2, 2001. Prior to the completion of the hearing, the Gateses reached an agreement with TDPRS that would allow TDPRS to question Marcus, Derodrick, Gary, and Melissa. The questioning took place that day, and TDPRS subsequently closed the case.[5]

C.    Third Incident–April 25, 2003

The final episode made part of this suit occurred on April 25, 2003. Ten days earlier, on April 15, 2003, the Richmond YMCA reported to TDPRS that Alexis had suspicious marks on her body. Specifically, the report indicated that over the past several weeks, Alexis was observed with bruises on her arms, legs, and face, and a belt-shaped slash on her back. When asked about the bruises, Alexis told YMCA personnel that she got them from falling off of her bed. Upon

---

[5] During the interviews, Marcus and Derodrick were asked sexual abuse questions, which upset the Gateses. The propriety of the sexual abuse questions was resolved in a state court suit filed by the Gateses. Gates v. Fort Bend County Child Advocates, Inc., No. 01-03-01298-CV, 2005 WL 1251988 (Tex. App.—Houston[1st Dist.] May 26, 2005, pet. denied).

receipt of the report, TDPRS determined that it would be best if the investigation was handled by the Fort Bend Sheriff's Department. To that end, Sergeant Lloyd Rowland ("Rowland") dispatched Detectives James Carlson ("Carlson") and Mary Spilman ("Spilman") to conduct the investigation. All three are Defendants-Appellees.

On April 25, 2003, Alexis and Marcus were attending a home/private school function at the YMCA along with their caretaker Ms. Kellough.[6] Carlson and Spilman donned YMCA shirts and, without Ms. Kellough's knowledge, took Alexis and Marcus into a separate room at the YMCA and questioned them for a short time. Based on the interviews, the sheriff's department decided to close the investigation. Gary and Melissa learned of the incident when Alexis and Marcus told them about it.

## II. PROCEDURAL HISTORY

The Gateses (Gary, Melissa, and all of their children) filed suit on February 8, 2002, bringing fourteen claims against TDPRS, Fort Bend, the Fort Bend County Sheriff's Department, the Fort Bend County District Attorney's Office, LCISD, and twenty-four individuals. The Gateses later supplemented their complaint to add the individuals involved in the April 2003 incident. The Gateses' claims include (1) unlawful search and seizure, (2) excessive force, (3) interference with family relations, (4) removal of children without a hearing, (5) intentional infliction of emotional distress, (6) assault and battery, (7) invasion of privacy and a § 1983 privacy claim, (8) false imprisonment, (9) abuse of civil process, (10) conspiracy, and (11) violation of the Texas constitution.[7]

---

[6] Due to repeated conflicts with LCISD, Gary and Melissa had pulled their children out of public schools and were home-schooling them.

[7] The Gateses also brought claims of unlawful retaliation, negligence, and violation of federally protected rights against individuals who are not part of this appeal.

The proceedings before the district court were protracted and contentious, spanning four and a half years. The district court held multiple hearings in an attempt to narrow the issues and eliminate extraneous parties, and the parties participated in an unsuccessful mediation. All of the defendants filed motions for summary judgment. The district court dismissed the claims against Fort Bend and its employees at a hearing on March 28, 2006. The district court dismissed the claims against the TDPRS and its employees without a hearing and in a one-page order issued on April 14, 2006.

Following the Gateses' settlement with LCISD, the district court entered a take-nothing judgment on August 1, 2006. The Gateses have appealed the dismissal of their claims against TDPRS and its employees and Fort Bend and its employees. We have jurisdiction under 28 U.S.C. § 1291 to hear their appeal.

## III. STANDARD OF REVIEW

This court reviews the grant of summary judgment de novo. Nichols v. Enterasys Networks, Inc., 495 F.3d 185, 188 (5th Cir. 2007). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, we view all of the evidence and factual inferences in the light most favorable to the non-moving party. Baker v. Am. Airlines, Inc., 430 F.3d 750, 753 (5th Cir. 2005).

Our review in this case is complicated by the district court's failure to provide clear reasons for its decision to grant summary judgment; instead, it issued single-page orders dismissing the defendants. It appears that the district court attempted to explain some of its reasoning at status conferences and

hearings in this case. However, review of the transcripts of the district court's comments reveals nothing more than that the court believed that the government's actions were "reasonable." The district judge did not cite any law or legal standard by which he was measuring the parties' actions, other than his own concept of what should be done in child abuse investigations.

As will be seen from this opinion, this case concerns areas of the law that have not yet been fully developed. The district court's manner of summarily dismissing the case was helpful to the parties only in that it moved the case toward a final resolution. The district court's actions, however, did nothing to advance the state of the law in this area and gave the parties absolutely no guidance on how to conduct themselves in the future.

Further, by failing to articulate clear reasons for the dismissal, the district court prevented the parties from being able to focus their briefs on specific issues on appeal. As we have stated before,

> The spotlight of the appeal is given its focus by the trial judge's written decision, which shapes and sharpens the issues and reveals the basis for his action. . . . When given such aid, counsel know what issues must be met and the appellate court need not scour the entire record while it ponders the possible explanations.

Jot-Em-Down Store (JEDS), Inc. v. Cotter & Co., 651 F.2d 245, 247 (5th Cir. Unit A July 1981); see also Myers v. Gulf Oil Corp., 731 F.2d 281, 284 (5th Cir. 1984) (noting that a statement of reasons for a district court's decision is "not only helpful, but essential" in all but the "simplest case" (internal quotation marks omitted)). In this case, there were over thirty defendants, fourteen causes of action, and approximately eight thousand pages of record, none of which contain a legal basis for the district court's decision. Because of the lack of a legal analysis by the district court, this court and the parties have had to start from scratch in addressing the issues.

In the past, we have not hesitated to remand a case to the district court for an explanation of its decision when no explanation was originally given. See, e.g., Myers, 731 F.2d at 284. However, given the amount of time and effort the parties have put into this litigation, a resolution of the case is appropriate, not a remand to give the district court another chance to properly address the issues. Therefore, we will consider the issues without the benefit of a district court analysis.

## IV. DISCUSSION

As noted above, the Gateses have appealed their claims against TDPRS and its employees and Fort Bend and its employees. The individual defendants in this case argue that they did not violate the Constitution or any other law and, alternatively, that they are entitled to qualified immunity for their actions. We will analyze the claims against the individual defendants under the qualified immunity rubric, as that will also encompass a consideration of the constitutionality of the child abuse investigation practices at issue. We will then consider the liability of the TDPRS and Fort Bend supervisors, and then the liability of TDPRS and Fort Bend.

A.    Qualified Immunity

All of the individual defendants in this case have asserted the defense of qualified immunity. Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Wallace v. County of Comal, 400 F.3d 284, 289 (5th Cir. 2005). In performing the qualified immunity analysis, the first question we must ask is whether, taken in the light most favorable to the plaintiffs, the facts alleged show that the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001); Aucoin v. Haney, 306 F.3d 268, 272 (5th Cir. 2002). If

no constitutional right would have been violated were the allegations established, the inquiry ends. Saucier, 533 U.S. at 201. If, however, the plaintiffs allege the violation of a constitutional right, we must then determine whether the right was clearly established at the time of the incident at issue. Id.; Aucoin, 306 F.3d at 272. A right is clearly established when its contours are "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Wooley v. City of Baton Rouge, 211 F.3d 913, 919 (5th Cir. 2000) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Finally, if the law was clearly established, we must decide whether the defendant's conduct was objectively reasonable. Aucoin, 306 F.3d at 272; see also Harlow, 457 U.S. at 818. We consider an official's conduct to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution. Hampton v. Oktibbeha County Sheriff Dep't, 480 F.3d 358, 363 (5th Cir. 2007).

In the summary judgment context, a government official need only plead qualified immunity, which then shifts the burden to the plaintiff. Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct. Id. Because the individual defendants have asserted their entitlement to qualified immunity, the Gateses bear the burden of overcoming that defense.

B.    Entry Into the Home

The Gateses' first claim is that the individual defendants entered the Gateses' home on February 11, 2000, without a warrant and in violation of the Fourth Amendment. There are two aspects to this claim: (1) whether the defendants' initial entry into the house was permissible, and (2) whether the

14

defendants' decision to remain in the house after Gary ordered them to leave was permissible.

### 1.   Initial Entry

The Gateses contend that TDPRS employees and Fort Bend deputies violated the Fourth Amendment by entering the Gateses' home without a warrant or court order on February 11, 2000.[8]   In response, the TDPRS employees and Fort Bend deputies assert that their entry into the Gateses' home was permissible because (1) the housekeeper, Menjivar, consented to their entry, (2) they were compelled by exigent circumstances, and (3) they met the reasonableness standard of the "special needs" doctrine.  The district court did not make clear which, if any, of those arguments it relied on when dismissing the case.[9]  Thus, we will consider all three arguments made by the defendants.

### a.   Whether Allegations Establish a Constitutional Violation

The first step in the qualified immunity analysis requires us to determine if the Gateses have alleged the violation of a constitutional right.  Saucier, 533 U.S. at 201.  We begin by noting that it is well established in this circuit that the Fourth Amendment regulates social workers' civil investigations.  Roe v. Tex. Dep't of Protective & Regulatory Servs., 299 F.3d 395, 401 (5th Cir. 2002); see also Wooley, 211 F.3d at 925 (stating that Fourth Amendment standards apply in both criminal and civil contexts).  Therefore, we will apply the typical Fourth Amendment standards in assessing the defendants' conduct.

"[P]hysical entry of the home is the chief evil against which the . . . Fourth Amendment is directed."  United States v. United States Dist. Court, 407 U.S.

---

[8] The TDPRS employees making the initial entrance were Odin, Haywood, Matthews, and Ramirez.  The Fort Bend deputies were Carrillo and Schaefer.

[9] During one of the hearings in this case, the district court stated that the report regarding Travis "was an adequate predicate for a warrantless intervention," which indicates that the district court may have been relying on exigent circumstances.

297, 313 (1972). Pursuant to our Fourth Amendment law, "[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." United States v. Gomez-Moreno, 479 F.3d 350, 354 (5th Cir. 2007); United States v. Gould, 364 F.3d 578, 587 n.9 (5th Cir. 2004); see also United States v. Mendez, 431 F.3d 420, 429 (5th Cir. 2005) ("Consensual searches are established exceptions to the Fourth Amendment's warrant requirement."). The Supreme Court has also carved out an exception to the warrant requirement in a few instances when there is a "special need" that is "'divorced from the State's general interest in law enforcement.'" Roe, 299 F.3d at 404 (quoting Ferguson v. City of Charleston, 532 U.S. 67, 79 (2001)). Therefore, we must now decide whether consent, exigent circumstances, or a special need justified the warrantless entry into the Gateses' house.[10]

### i. Consent

The individual defendants first argue that their entry into the Gateses' home was constitutional because Menjivar, the Gateses' housekeeper, gave them consent to enter. This court determines whether consent was given based on the totality of the circumstances. United States v. Freeman, 482 F.3d 829, 831-32 (5th Cir. 2007). "[T]he standard for measuring the scope of . . . consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).

In this case, the parties dispute whether Menjivar gave consent for the TDPRS employees and Fort Bend deputies to enter the house. As noted earlier, although a few believe they had consent to enter, none of the individual

---

[10] It is undisputed that the individual defendants did not obtain a court order to enter the house pursuant to Texas Family Code § 261.303(b). Such an order would have been the equivalent of a warrant in this situation.

defendants remember what was said. Menjivar asserts that she did not intend for the individuals to enter and that no one ever asked for permission to enter. However, she admits that she did not tell the defendants that they could not enter and she also indicated that they could interview the children when the children arrived home.[11]

We have previously held that "[s]ilence or passivity cannot form the basis for consent to enter." Roe, 299 F.3d at 402. Further, "[i]t is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." United States v. Jaras, 86 F.3d 383, 390 (5th Cir. 1996). Here, no defendant was able to testify that Menjivar affirmatively consented to let them into the house. Yet, Menjivar's statement that she told them that they could speak with the children might have indicated to a reasonable officer that he or she had permission to enter the house. These facts present a very close call; however, taken in the light most favorable to the Gateses, this raises a fact issue as to whether consent was actually given.[12]

---

[11] Menjivar specifically stated, "What I told [the defendants] was that the children were on their way and that they would be able to speak with them because I don't know anything about it."

[12] We reject the Gateses' assertion that consent was denied when Gary told Davis that he did not want TDPRS to interview his children. There is no evidence that the individuals at the scene were aware of this statement, so they cannot be held accountable for proceeding in spite of Gary's wishes.

### ii.    Exigent Circumstances

The next legal theory relied upon by the individual defendants that would permit a warrantless entry into the Gateses' home is exigent circumstances. "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City v. Stuart, 547 U.S. 398, 403 (2006); see also Michigan v. Tyler, 436 U.S. 499, 509 (1978) (stating that a warrantless entry may be legal "when there is compelling need for official action and no time to secure a warrant"). Immediate safety risks to police officers and others are exigent circumstances that may excuse a warrantless entry into a residence. United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001). The Tenth Circuit has used the exigent circumstances analysis to evaluate the legality of a warrantless entry into a home for the purposes of seizing a child who might have been abused. Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1240-41 (10th Cir. 2003). In similar circumstances, the Third Circuit has required that "the state actors making the search . . . have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." Good v. Dauphin County Soc. Servs. for Children & Youth, 891 F.2d 1087, 1094 (3d Cir. 1989).

Here, the individual defendants argue that exigent circumstances existed based on the report by LCISD regarding Travis and the interviews of Will, George, and Scott. The defendants further point out that they are commanded by statute to investigate allegations of child abuse. See TEX. FAM. CODE ANN. § 261.301(a) (stating that TDPRS and law enforcement "shall make a prompt and thorough investigation of a report of child abuse"). The Gateses counter that the allegations in the LCISD report and any subsequent comments by Will, George, and Scott do not suffice as exigent circumstances. The Gateses further

point out that the defendants have never shown that there was insufficient time in the day to seek a court order that would have permitted the entry.

We can first easily dispose of any contention that the Texas Family Code's requirement that TDPRS undertake a "prompt" investigation somehow exempts the defendants' actions from constitutional scrutiny. A statutory command to investigate allegations within twenty-four hours is not a license to ignore the Fourth Amendment, and it is unreasonable for the defendants to think otherwise. See Sibron v. New York, 392 U.S. 40, 60-61 (1968) (holding that, although a state may develop its own search and seizure law, the state may not authorize police conduct that infringes Fourth Amendment rights). Regardless of what Texas law may authorize, entry into a house by the individual defendants must satisfy Fourth Amendment standards.

Therefore, we next consider whether exigent circumstances existed that permitted the individual defendants to make a warrantless entry into the Gateses' house.[13] The individual defendants claim that exigent circumstances were present, based on information that Gary had pushed and kicked Travis that morning, had handcuffed Travis to his bed at some point, and used unusual discipline methods.

There is no Fifth Circuit precedent directly on point regarding when a social worker may enter a home due to exigent circumstances. In Wooley, this court denied summary judgment on the issue of qualified immunity to officers

---

[13] The Gateses erroneously contend that any fact issue regarding the truth of the allegations in the LCISD report precludes summary judgment, relying on Tamez v. City of San Marcos, 118 F.3d 1085, 1094 (5th Cir. 1997). This misconstrues the exigent circumstances analysis. Tamez does not require that the underlying criminal conduct be established before an officer may act on exigent circumstances. Instead, Tamez only requires that the officer establish the existence of facts that would lead a reasonable officer to believe there was an emergency. See id. Here, it is undisputed that an LCISD employee made a report to TDPRS about Travis. Whether the allegations in the report were ultimately proven to be true or false has no bearing on whether a reasonable officer could have believed exigent circumstances existed on the basis of the report alone.

who entered a home and seized a child pursuant to a court order when the order did not authorize the seizure. 211 F.3d at 925. There, we noted that there was no evidence of any danger to the child that would enable the state to act without a warrant. Id. That case, however, turned more on the validity of the court order, rather than on any danger to the child. Id. In Roska, government officials entered a house without a warrant and removed a child suspected of being abused. 328 F.3d at 1238. The Tenth Circuit determined that there were no exigent circumstances justifying the warrantless entry into the home. Id. at 1240-41. The court based its decision on the fact that the defendants were aware that various doctors had suspected for some time that the child was a victim of abuse, there was nothing particularly unusual about the child's condition at the time he was removed, and the child's attending physician told the defendants it would be a mistake to remove the child. Id. In that case, the removal took place two days after the school reported its suspicions to child protective services. Id. at 1238.

Turning to the facts of this case, we agree with the Gateses that there were no exigent circumstances present at the time of the defendants' initial entry into the Gateses' house that would have permitted the warrantless intrusion. First, Gary, the alleged abuser, was not at home, so there was no immediate danger to the children. Also, at that time, TDPRS was not aware of any allegations that Gary had abused any of his children besides Travis, other than his unusual discipline methods.[14] We further note that none of the TDPRS employees treated these interviews as emergencies. The Gateses point to deposition testimony by Davis that the interviews conducted at the Gateses'

---

[14] The unusual discipline methods include running, sitting against the wall in a chair position, and moving bricks and boards around the driveway. We make no determination on whether those forms of discipline constitute child abuse, leaving that instead to the state courts. We do note, however, that those discipline methods presented no immediate risk to the life or health of any of the Gates children at that time.

home were routine, non-emergency interviews. In fact, the TDPRS employees went to lunch after interviewing Will, George, and Scott at school without taking any emergency measures. Carrillo also testified that he did not witness any exigent circumstances or emergency situation at the Gateses' home.

Thus, at the time the individual defendants approached the house, the only evidence of danger to the Gates children was a one-time incident involving only Travis and the questionable discipline methods. These facts do not give rise to an "immediate danger" supporting a warrantless entry into the Gateses' house. Indeed, the stated purpose of entering the house was to interview the children, not to guard them against some sort of immediate danger. Consequently, we conclude that the individual defendants' entry into the Gateses' house was not justified by exigent circumstances.

### iii.   Special Needs

Finally, the individual defendants argue that the "special needs" doctrine supports their warrantless entry into the Gateses' house. As we have described it, the special needs doctrine permits warrantless searches with respect to a special need that is divorced from the state's general interest in law enforcement. Roe, 299 F.3d at 404. Examples of recognized special needs are:

> a principal's search of a student's purse for drugs in school; a public employer's search of an employee's desk; a probation officer's warrantless search of a probationer's home; a Federal Railroad Administration regulation requiring employees to submit to blood and urine tests after major train accidents; drug testing of United States Customs Service employees applying for positions involving drug interdiction; schools' random testing of student athletes, and drug testing of all public school students participating in extracurricular activities.

Id. (citing multiple Supreme Court cases). In cases involving a special need, the court judges the lawfulness of the search by "the standard of reasonableness under all of the circumstances" instead of a probable cause or reasonable suspicion standard. Id. (internal quotation marks omitted).

Key to the special needs doctrine, however, is that the need must be divorced from the purpose of general law enforcement. Ferguson, 532 U.S. at 79. As we stated in Roe, we "view[] entanglement with law enforcement suspiciously," and "[o]ther societal objectives cannot justify a program that would systematically collect information for the police." 299 F.3d at 406. In Roe, we held that the special needs doctrine did not permit a social worker to visually search a child's body cavities as part of an abuse investigation without a warrant or exigent circumstances. Id. at 406-07. In reaching that conclusion, we noted that Texas law requires TDPRS to notify law enforcement of all child abuse reports. See TEX. FAM. CODE ANN. § 261.105(b). Further, Texas law also requires TDPRS and local law enforcement to conduct a joint investigation when a report alleges that the child is at risk of immediate physical or sexual abuse. Id. § 261.301(f). Given that the social worker's search in Roe was "intimately intertwined with law enforcement," we concluded that the special needs doctrine could not apply. Roe, 299 F.3d at 407.

The Tenth Circuit has also held that the special needs doctrine will not permit a social worker to enter a home to remove a child absent a warrant or exigent circumstances. Roska, 328 F.3d at 1242. The Second Circuit, however, has refrained from setting forth a categorical rule that removal of a child from a home can never be pursuant to a special need. Tenenbaum v. Williams, 193 F.3d 581, 604 (2d Cir. 1999) (noting that there may be circumstances in which the law of warrant and probable cause would not work effectively in the child removal or child examination context).

Applying the reasoning of Roe, there was no special need in this case. The purpose of TDPRS's entry into the Gateses' home—the investigation of possible child abuse—was closely tied with law enforcement for the same reasons articulated in Roe. Indeed, law enforcement personnel accompanied the TDPRS employees into the home and were called back when TDPRS needed assistance.

Therefore, because the need to enter the Gateses' home was not divorced from the state's general interest in law enforcement, there was no special need that justified the entry.

In a related argument, the individual defendants, specifically the Fort Bend employees, contend that the Supreme Court in Wyman v. James, 400 U.S. 309 (1971), relaxed the requirement for entering homes when the welfare of children is involved. At issue in Wyman was whether an AFDC beneficiary could refuse a home visit by a caseworker without risking the termination of benefits. Id. at 310. In part of its analysis, the Court stated that the public's interest in the welfare of children was one factor that indicated the visits were not unreasonable. Id. at 318. However, the Court also noted that the visits concerned welfare programs, not alleged criminal activity. Id. at 322-23. More importantly, the portion of the Court's opinion regarding the welfare of children was dicta, as the Court first held that the visits did not implicate the Fourth Amendment in the first place. Id. at 317-18; see also Roe, 299 F.3d at 405 (finding that portion of Wyman to be dicta). Therefore, Wyman does not support lowering the Fourth Amendment standard for entering houses for the purpose of interviewing children about possible abuse.

In conclusion, because the visit to the Gateses' home to investigate possible child abuse was not separate from general law enforcement, the special needs doctrine cannot be used to justify the warrantless entry. Therefore, the typical Fourth Amendment standards of a court order, consent, or exigent circumstances apply and, as discussed above, the individual defendants are not entitled to summary judgment with respect to any of those standards. Therefore, taken in the light most favorable to them, the Gateses have alleged a constitutional injury with respect to the individual defendants' initial entry into the Gateses' home.

b. Whether the Constitutional Right Was Clearly Established

Having concluded that the Gateses have alleged a constitutional violation with respect to the initial entry into their home by the TDPRS employees and Fort Bend deputies, we proceed to the next step in the qualified immunity analysis—whether the Gateses' constitutional rights were clearly established at the time of the alleged violation. See Saucier, 533 U.S. at 201. Although the law regarding consent and exigent circumstances has been clearly established for some time, we conclude that the law regarding the special needs exception, as arguably applied to the facts of this case, was not clearly established.

We first consider whether it was reasonable for the individual defendants to believe that the state's interest in investigating child abuse allegations presented a special need that would relax the Fourth Amendment warrant requirement. See Anderson, 483 U.S. at 640 (holding that a "clearly established" right depends on what a reasonable official would understand the law to be). Special needs that have been recognized by the Supreme Court include the need of teachers and administrators to maintain order in the schools, the need to adequately supervise individuals on probation, and the need to deter drug use among students. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 661 (1995) (permitting drug testing of certain students); Griffin v. Wisconsin, 483 U.S. 868, 875 (1987) (permitting search of probationer's home); New Jersey v. T.L.O., 469 U.S. 325, 341 (1985) (permitting search of student's purse). In each of those circumstances, the Court explained that the doctrine allowed some invasions of privacy when there was a special need "beyond the normal need" for law enforcement that made the warrant and probable cause requirement "impracticable." See, e.g., Vernonia Sch. Dist., 515 U.S. at 653.

Turning to the need to investigate allegations of child abuse, we note that this court has recognized that the state has an interest in protecting the health,

safety, and welfare of children. Wooley, 211 F.3d at 924; see also Wyman, 400 U.S. at 318 (referring to a dependent child's needs with respect to AFDC benefits as "paramount" and stating that "[t]here is no more worthy object of the public's concern"). Considering the state's interest in the welfare of children, it was not unreasonable for the individual defendants to conclude that the need to protect children from abuse went "beyond" a general interest in law enforcement. Further, it was not until after the February 2000 events in this case that the Supreme Court began to state that the special need must be "divorced" from the state's general interest in law enforcement. See Ferguson, 532 U.S. at 79. Although it is not clear that the Supreme Court intended a change in the special needs standard by using the "divorced" language, it is more reasonable to conclude that the state's interest in preventing child abuse goes "beyond" the need for law enforcement, as opposed to being "divorced" from it, thereby bringing it within the realm of the special needs doctrine. See Roe, 299 F.3d at 409 (referring to the Supreme Court's pre-Ferguson special needs test as "vague").

Additionally, this court in Roe noted that we had not yet "fleshed out the relevant Fourth Amendment standards" with respect to entering a house in order to investigate allegations of child abuse, as previous cases had not required us to choose between traditional Fourth Amendment standards and the special needs doctrine. Id. at 401. We further stated that "[s]electing the applicable test for a social worker's investigative home visit would be a question of first impression in this circuit—an issue over which other courts of appeals have divided." Id. (citing Wildauer v. Frederick County, 993 F.2d 369, 372 (4th Cir. 1993) (applying a standard that was lower than the traditional Fourth Amendment standard), Good, 891 F.2d at 1094-95 (applying the traditional Fourth Amendment standard), and Calabretta v. Floyd, 189 F.3d 808, 813 (9th Cir. 1999) (applying the traditional Fourth Amendment standard)). Ultimately,

though, we did not reach the issue of whether the special needs test applied to a social worker's entry into a house for investigative purposes because we concluded that the homeowner had given her consent to the entry. Id. We did conclude, however, that the application of the special needs doctrine to a social worker's visual search of a child's body cavities was not clearly established in 1999, in light of the lack of precedent concerning that area of law. Id. at 409-11.

Given the statements in Roe that the court had not yet established the constitutional standard for entering a home for purposes of investigating child abuse, it is clear that the law in this area was not clearly established in February 2000. See id. at 409-10 ("It is difficult to argue that a matter of law is clearly established for state actors in this circuit where this court has not opined on the issue in question and the other circuits are in disagreement as to whether the challenged acts constitute a constitutional violation."). Further, although we have held that the special needs doctrine was inapplicable in this situation, it was not unreasonable for the individual defendants to believe in February 2000 that their need to enter the Gateses' home in order to investigate allegations of child abuse went beyond the normal need for law enforcement in light of the state's avowed interest in the health and safety of children. Consequently, because the constitutional standard for entry into the Gateses' house was not clearly established in February 2000 and it was reasonable for the individual defendants to believe that the special needs doctrine applied, the individual defendants are entitled to summary judgment on the basis of qualified immunity.

2.      Remaining in the Home

The next issue before us is whether the individual defendants violated the Fourth Amendment after Gary returned home and ordered the defendants out

of his house.[15]   We again consider the doctrines of consent, exigent circumstances, and special needs in determining the constitutionality of the defendants' actions.

The district court held that once consent is given to enter a house, it cannot be revoked.  If that was the basis for the district court's holding, it erred, as it is clearly established that "[a] consent which waives Fourth Amendment rights may be limited, qualified, or withdrawn."  United States v. Ho, 94 F.3d 932, 936 n.5 (5th Cir. 1996); see also Mason v. Pulliam, 557 F.2d 426, 428-29 (5th Cir. 1977).  It makes no difference in our analysis that it was Gary who was revoking Menjivar's alleged consent.  The Supreme Court recently held that when a physically present co-occupant of a home objects to a warrantless search, the search may not take place, even if another occupant has given consent.  Georgia v. Randolph, 547 U.S. 103, 106 (2006).  It is only a small step to conclude that a physically present co-occupant may revoke or withdraw the consent given by another occupant.  Therefore, if the individual defendants' entry was based on Menjivar's consent and Gary revoked that consent upon his return home, the defendants violated the Gateses' Fourth Amendment rights by remaining in the house, absent a court order or exigent circumstances.

As for exigent circumstances, the exigency remained the same as when the defendants first entered the house, with the exception of Gary's return.  There is no evidence that the TDPRS employees learned new damaging information from the children in the few minutes that they had been present.  Further, there is no evidence that Gary displayed any anger towards his children or gave any indication that he might abuse them in the immediate future.  As noted by the Second Circuit in a due process context, "[e]mergency circumstances mean

---

[15] The individual defendants involved here are Odin, Haywood, Ramirez, and Matthews, who were TDPRS employees, and Carrillo, Schaefer, and Chapman, who were Fort Bend deputies.

27

circumstances in which the child is immediately threatened with harm. . . .[T]he mere possibility of danger is not enough." Tenenbaum, 193 F.3d at 594 (internal citation and quotation marks omitted). Here, there was no immediate threat that required the individual defendants to remain and continue the interviews in the absence of a court order. Therefore, the individual defendants cannot rely on exigent circumstances to justify their decision to remain in the home.

Finally, for the reasons noted above, the special needs doctrine will not support the decision to remain in the home in the absence of a court order, consent, or exigent circumstances. Therefore, the Gateses have alleged that the individual defendants violated the Fourth Amendment when the defendants did not leave the Gateses' house upon the request of Gary.

Moving to the second step in the qualified immunity analysis, however, we note that the law in this area, particularly with respect to the special needs doctrine, was not clearly established in 2000, as described in the previous section. If the law was not clearly established at the time of the alleged constitutional violation, the individual defendants are entitled to qualified immunity. See Aucoin, 306 F.3d at 272. Thus, although the Gateses' rights may have been violated, summary judgment on this issue was appropriate.

C.    Seizing the Children from the Home

Next, the Gates children claim that their Fourth Amendment rights were violated when the TDPRS employees and Fort Bend deputies seized them by removing them from their home without a court order on February 11, 2000. The individual defendants contend that the seizure was justified pursuant to exigent circumstances, namely the threat of abuse and the inability to obtain a court order that evening, and that they are entitled to qualified immunity. The Fort Bend deputies further argue that they were entitled to rely on the decision made by TDPRS to remove the children. The Gateses counter that there was no evidence of an immediate danger to the children, that the defendants had all day

to obtain a court order but failed to do so, and that the Fort Bend deputies may not blindly rely on TDPRS's decision to remove the children. We will analyze each group of defendants separately.

1.    TDPRS Employees

We begin with the TDPRS employees, as they were the individuals responsible for interviewing the Gates children and making the decision to seize them from the Gateses' house. As with the entry into the Gateses' house, we must first define the Fourth Amendment standards that apply in this situation. This court has previously held that the Fourth Amendment, which protects against unreasonable seizures, applies to the seizure of children from their homes. Wooley, 211 F.3d at 925. To determine the reasonableness of a seizure under the Fourth Amendment, we balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Id. (quoting United States v. Place, 462 U.S. 696, 703 (1983)).

We begin by noting that seizing a child who may be the victim of abuse presents a different Fourth Amendment dynamic than seizing an individual suspected of criminal wrongdoing. In the latter case, the government seizes the individual in order to keep that individual from harming others, while in the former case, the child is seized to keep others from harming him. Thus, while a Fourth Amendment seizure has taken place when the government seizes the alleged victim of child abuse, the government's interest is primarily in protecting the child, not in restricting the child's freedoms. Therefore, when courts are called upon to balance the child's Fourth Amendment rights with the government's interests, it is important to recognize that the child's interests may align with the government's interests if, indeed, the child is at risk of abuse.

In Roe, we noted in dicta that social workers may seize a child when exigent circumstances exist, specifically if they have reason to believe that life

29

or limb is in immediate jeopardy. 299 F.3d at 407. However, we have never described in more detail the circumstances that will permit the warrantless seizure of such a child. Other circuits, however, have considered this question in depth and have reached differing conclusions.

The Ninth and Tenth Circuits have adopted the strictest standards for removal of a child, requiring an immediate danger to the child's life or health and the inability to obtain a warrant before the abuse might occur. The Ninth Circuit recently held that there must be "reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." Rogers v. County of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007) (noting that, in the due process context, social workers must have "reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury" (internal quotation marks omitted)). The Tenth Circuit similarly requires reasonable grounds to believe that there is an immediate need to protect the life of the child. Roska, 328 F.3d at 1242 ("Simply put, unless the child is in imminent danger, there is no reason that it is impracticable to obtain a warrant before social workers remove a child from the home.").

The Second Circuit permits the removal of a child pursuant to exigent circumstances when "information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed from [home] before court authorization can reasonably be obtained . . . ." Tenenbaum, 193 F.3d at 605. However, the court refrained from creating a categorical rule that a lesser standard would never be appropriate. Id. at 604 ("There may be circumstances in which the law of warrant and probable cause established in the criminal setting does not work effectively in the child removal or child examination context.").

The First and Eleventh Circuits have considered the removal of a child in the context of a due process analysis. The First Circuit opted for a rule that would permit social workers to take temporary custody of a child without a court order when the social worker "has a reasonable suspicion that child abuse has occurred (or, alternatively, that a threat of abuse is imminent)." Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 22 (1st Cir. 2001). There, the court specifically rejected a proposed rule that would have required the social worker to have "reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." Id. at 21 (internal quotation marks omitted). The Eleventh Circuit simply attempted to balance all of the interests involved. Doe v. Kearney, 329 F.3d 1286, 1295 (11th Cir. 2003). Notably, though, the Eleventh Circuit declined to make the inability of a social worker to timely obtain a court order dispositive of the exigent circumstances analysis, instead choosing to consider it as part of an overall balancing. Id. at 1297-98 (rejecting the Second Circuit's statement in Tenenbaum that there can be no emergency removal unless there is insufficient time to obtain a court order).

In the instant case, the Gateses contend that the defendants are attempting to create a "child abuse" exception to the Fourth Amendment. Regardless of the defendants' intentions, we agree with the Gateses that any sort of categorical rule that applies only in child abuse cases is not appropriate in the Fourth Amendment analysis. "The Fourth Amendment caselaw has been developed in a myriad of situations involving very serious threats to individuals and society, and we find no suggestion there that the governing principles should vary depending on the court's assessment of the gravity of the societal risk involved." Good, 891 F.2d at 1094.

That being said, there is no doubt that child abuse is a heinous crime, and the government's interest in stopping abuse and removing children from abusive

31

situations is paramount.  As noted earlier, seizures due to allegations of child abuse present a unique dynamic in Fourth Amendment jurisprudence which cannot be ignored.  Deciding what is reasonable under the Fourth Amendment will require an assessment of the fact that the courts are dealing with a child who likely resides in the same house as, and is under the control of, the alleged abuser.  The analysis cannot be divorced from that fact, but that fact does not override all other Fourth Amendment considerations.

Therefore, we hold that the government may not seize a child from his or her parents absent a court order,[16] parental consent, or exigent circumstances. Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home.  This is a flexible inquiry that considers all of the facts and circumstances with no one factor being dispositive.  Thus, for example, we agree with the Eleventh Circuit in Doe that the question of whether there was time to obtain a court order is only one factor that informs the reasonableness analysis; it is not a dispositive issue.  Other non-exclusive factors the court might consider are the nature of the abuse (its severity, duration, and frequency), the strength of the evidence supporting the allegations of abuse, the risk that the parent will flee with the child, the possibility of less extreme solutions to the problem, and any harm to the child that might result from the removal.

Using that standard, we consider the facts of the instant case, paying careful attention to what information was known by the TDPRS employees making the decision to remove the Gates children.  As noted earlier, Travis displayed two small wounds that had allegedly been inflicted by Gary.  Several

---

[16] An order properly issued by a court pursuant to Texas Family Code § 262.102, which authorizes state courts to issue emergency orders to take possession of a child, would have sufficed to meet the "warrant" requirement in this instance.

32

children corroborated the story that Gary had punched or kicked Travis that morning. The children also spoke of Gary's unusual discipline methods, which could be abusive if carried to an extreme. Gary had forced at least two of his children (Travis and Alexis) to throw up food they had eaten and had allegedly handcuffed Travis to a bed. Timothy expressed fear of his father because Gary "hurt[] Travis and the big kids." Cynthia stated that Gary had hit Cassandra and Andrew the previous day and that she was scared to live at home because of Gary's anger.[17]

Based on this information, we do not believe that it was unreasonable for the TDPRS employees to conclude that the children needed to be removed from their home that day. There were allegations of recent physical abuse of multiple children—Travis, "the big kids," Cassandra, and Andrew. Further, some of the allegations had been corroborated by several children, giving the claims more credence. There is no evidence that TDPRS was able to gather all of this information before the state courts closed that day, so obtaining a court order in a timely fashion was likely not possible. Further, TDPRS considered and ruled out the less drastic options of having Gary vacate the house or placing the children with a family friend, concluding that Melissa or the family friend might not keep Gary away. Although it is a close call, we conclude that the TDPRS employees did not violate the Fourth Amendment rights of the Gates children

---

[17] To be clear, we did not consider most of these facts in the exigent circumstances analysis regarding the individual defendants' entry into the Gateses' house because there was no evidence the individual defendants had learned this information at that time. Several of these facts came to light only after the Gates children were interviewed in their home.

by seizing them without a court order.[18] Consequently, summary judgment was appropriate on this issue.

Our conclusion that TDPRS's seizure was reasonable under the exigent circumstances standard also means that the seizure of Will from his high school dance was reasonable. Once the TDPRS employees decided that all of the children needed to be removed, they did not need to wait for Will to return home and be exposed to the possibly dangerous circumstances before seizing him. Judged under a standard of reasonableness, the seizure of Will was not unconstitutional, and summary judgment was proper on that claim as well.

2.    Fort Bend Employees

The Gates children also fault the Fort Bend deputies for their roles in the seizure that evening and argue that the deputies may not blindly rely on TDPRS's conclusions to justify their actions. Because we have determined that TDPRS did not violate the Fourth Amendment by seizing the Gates children, we also conclude that the Fort Bend deputies acted constitutionally.

We note that the Supreme Court has held that police officers may act on the basis of information known by their colleagues in conducting searches and seizures. See United States v. Hensley, 469 U.S. 221, 230-231 (1985); see also Whiteley v. Warden, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."). As stated by the Ninth Circuit, "[E]ffective law enforcement cannot be conducted unless

---

[18] There is no conflict between this decision and the state court's decision on February 14, 2000, that there was not sufficient danger to the children to justify keeping them from their parents. The state court was applying the standard from Texas Family Code § 262.107 rather than the Fourth Amendment. Further, the state court never held that the initial seizure was unjustified under Texas law. See TEX. FAM. CODE ANN. § 262.104(a) (authorizing the seizure of children without a court order if a person of ordinary prudence and caution would believe there is an immediate danger to the physical health or safety of the children).

police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976).

Because TDPRS concluded that it was necessary to remove the Gates children, the Fort Bend deputies were entitled to reasonably rely on TDPRS's assessment of the situation. The Fort Bend deputies' reliance was reasonable in this case because the deputies were aware that the TDPRS employees had questioned the children for several hours, which would indicate that TDPRS was making an informed decision. Further, the Gateses did not present any evidence that TDPRS had routinely made unconstitutional decisions to remove children in the past, which might have given the Fort Bend deputies pause before agreeing to assist the TDPRS employees. Consequently, the Fort Bend deputies did not violate the Gates children's Fourth Amendment rights in assisting TDPRS in removing the children from their home.[19]

D.    Seizing the Children from School and at the YMCA

Next, Travis, Alexis, and Marcus contend on appeal that the district court failed to address their arguments that various defendants violated the Fourth Amendment when those defendants seized them from their schools and the YMCA without a court order. While the district court ruled that the YMCA seizure was reasonable, it does not appear that the district court specifically considered the seizures from the schools. We will first analyze the claims regarding taking the children from school and then the claim regarding speaking to the children at the YMCA.

---

[19] In the interest of thoroughness, we note that any claims of unlawful entry into the Gateses' house by Millsap, Wright, and Lee for the purpose of assisting in the removal of the children must also be dismissed for this reason.

1.    Seizing Travis and Alexis from Their Schools

Travis and Alexis claim that their Fourth Amendment rights were violated when (1) Davis removed Travis from his school on February 11, 2000, and took him to the CAC for an interview and (2) Sterns removed Alexis from her school on January 25, 2001, and took her to the CAC for an interview.[20]  As with the claim based on the seizure of the children from their home, the Fourth Amendment governs our analysis of this claim.

A person is "seized" under the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (internal quotation marks omitted).  Under this standard, we have little trouble concluding that Travis and Alexis were "seized" when they were removed from their school by TDPRS employees.  Thus, the next question is whether the seizures were unreasonable.

In assessing the reasonableness of a seizure, we are to balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests that justify the intrusion. Place, 462 U.S. at 703.  The Gateses would have us adopt an exigent circumstances standard similar to the one employed when children are seized from their homes for the purposes of taking them into state custody.  Such a blanket rule, however, fails to account for the differences in the nature and quality of the intrusion.  Temporarily seizing a child from a public school in order to interview him in a safe place is decidedly different than seizing a child from his home for the purpose of removing him from allegedly abusive parents.

To begin with, the rights of children to freely move about, especially within a public school, are not as extensive as adults' rights.  The Supreme Court has

---

[20] Although Sterns is not a party to this appeal, Alexis's claim encompasses conduct by Polasek (who ordered the seizure) and TDPRS.

recognized that Fourth Amendment rights of children "are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." Vernonia Sch. Dist., 515 U.S. at 656. Thus, while the Fourth Amendment is not non-existent, students have a lesser expectation of privacy. See id. at 656-57. Further, unemancipated minors lack the right to come and go at will, remaining subject to the control of their guardians or parents. Id. at 654. Consequently, seizing a child from a public school is a lesser intrusion into the freedoms the child would otherwise enjoy, as those freedoms have already been limited.

Next, the nature and scope of the intrusion into the child's rights is relatively small. The seizures in this case were for the purpose of interviewing the children for their own protection. As described above, the CAC was created with the purpose of reducing trauma to the possible victims of child abuse by coordinating child abuse investigations among the various branches of government. See TEX. FAM. CODE ANN. §§ 264.403, 264.405. Although claiming that the seizure of a child is for his benefit will not automatically justify a seizure, it is a factor that should be taken into account.

Cases from other circuits do not provide a clear rule as to what constitutional standard should be used, but they do indicate that the test should be flexible enough to account for the unique interests involved in child abuse investigations. The Second Circuit has employed an exigent circumstances analysis to determine whether removing a child from school in order to undergo a physical exam for evidence of sexual abuse is constitutional. Tenenbaum, 193 F.3d at 605. The court indicated, though, that an exigent circumstances analysis might not always be appropriate in the child examination context; however, the court did not elaborate as to what situations might call for a lower standard. Id. at 604. The Seventh Circuit, in a public school setting, has held that searches of children's bodies for evidence of physical abuse need only meet a

reasonableness standard. Darryl H. v. Coler, 801 F.2d 893, 902-03 (7th Cir. 1986) (noting the state's "very special responsibility" to the children of the community).[21]

Given the differences in the freedoms enjoyed by children inside a public school, the nature and scope of the seizures at issue, and the need to promptly investigate and act upon allegations of child abuse, we believe an exigent circumstances analysis sets too high a threshold for the state to overcome when investigating allegations of child abuse. However, removing a child from a public school solely on the basis of an anonymous report is not a constitutional solution either. The answer lies somewhere in between.

We return to traditional Fourth Amendment law. Here, the TDPRS employees were brought to the schools on the basis of anonymous tips made to a child abuse hotline. Just as "an anonymous tip, standing alone, is rarely sufficient to provide probable cause for a warrant," Kohler v. Englade, 470 F.3d 1104, 1110 (5th Cir. 2006), an anonymous tip regarding child abuse will rarely be sufficient to justify the seizure of a child. However, anonymous tips that have been independently corroborated by government officials may provide sufficient grounds to seize a child. See United States v. Martinez, 486 F.3d 855, 863 (5th Cir. 2007) (noting that anonymous tips that have been corroborated may provide reasonable suspicion for an investigatory stop). Thus, before seizing a child on the basis of an anonymous tip, TDPRS must sufficiently corroborate the tip by initiating its own investigation. This might involve a preliminary interview of the child, his teachers, or peers, or perhaps a visual inspection of any injuries that can be seen without the removal of the child's clothing.

---

[21] The Seventh Circuit uses an exigent circumstances analysis when the child is in private, as opposed to public, school. Doe v. Heck, 327 F.3d 492, 517 (7th Cir. 2003). Here, we are concerned only with removal of a child from public school.

Taking all of the above precedent into account, we hold that before a social worker can remove a child from a public school for the purpose of interviewing him in a central location without a court order, the social worker must have a reasonable belief that the child has been abused and probably will suffer further abuse upon his return home at the end of the school day.[22] This reasonable belief must be based on first-hand observations of TDPRS employees,[23] unless the anonymous report shows significant indicia of reliability. As with removing a child from the home, this is a totality of the circumstances analysis that should consider all of the facts of which the social worker is aware. It may be, too, that the child is more comfortable being interviewed at his school than at a strange location, so a social worker should take into account any of the child's express desires.

Applying that standard here, both seizures violated the Fourth Amendment. Beginning with Travis, at the time Davis seized Travis from the school, the only information that she had corroborated was the existence of the baggie full of wrappers. She also observed two small marks on Travis's hand and face, but there is no indication that she asked Travis how he had received the marks. Although the anonymous reporter made allegations of emotional abuse, the allegations are void of information that would indicate a likelihood of physical abuse were Travis to return home, and Davis did not uncover any such evidence before seizing Travis. Therefore, Davis could not have had a reasonable belief that Travis had been or likely would be abused at his home.

Similarly, the anonymous report regarding Alexis indicated that she had a bruise and had, at one point, stated that her father had given it to her.

---

[22] This is a lower standard than exigent circumstances in that it does not require that the child be in "imminent danger" of abuse.

[23] TDPRS employees may rely on the investigations of other TDPRS employees in making the decision to remove a child from school.

Polasek ordered Sterns to pick up Alexis from her school on the basis of the anonymous report alone. Prior to removing Alexis, Sterns confirmed the existence of the bruise, but made no attempt to discover its origin before removing Alexis from school. Thus, again, the TDPRS employees did not have sufficient evidence to warrant seizing Alexis from school without a court order.

Because Travis and Alexis have stated a claim for the violation of their Fourth Amendment rights, we must now consider whether those rights were clearly established at the time the violations occurred. See Saucier, 533 U.S. at 201. As with some of the other claims in this case, the law in this area was simply not clearly established at the time of the incidents at issue. This court has never before set out a Fourth Amendment standard for this type of seizure, and the other circuit courts have either been silent or reached ambiguous conclusions on this issue. It would not be reasonable to expect the TDPRS employees in this case to comply with a constitutional standard that we have not articulated until today. Consequently, because the law regarding seizing children from school for the purpose of interviewing them without a court order was not clearly established at the time Travis and Alexis were seized, the TDPRS individuals involved are entitled to qualified immunity.

2. The YMCA Incident

Alexis and Marcus also argue that several Fort Bend deputies violated their Fourth Amendment rights when they moved Alexis and Marcus into a separate room at the YMCA in order to interview them about allegations of abuse. We agree with the district court that this seizure was reasonable. The intrusion was minor (simply being moved to a separate room) and of short duration. The children were questioned about the allegations and released. This was very similar to an investigatory detention, as approved in Terry v. Ohio, 392 U.S. 1, 21-22 (1968), in that it was supported by reasonable suspicion

and was no more intrusive than necessary. There is nothing to suggest that the Fort Bend deputies stepped outside their constitutional bounds.

E.    Due Process Claims

Gary and Melissa next contend that their due process rights under the Fourteenth Amendment were violated by the seizures of their children without a court order or exigent circumstances. The Supreme Court has held that parents have a "fundamental liberty interest . . . in the care, custody, and management of their child . . . ." Santosky v. Kramer, 455 U.S. 745, 753 (1982). Consequently, before parents may be deprived of that interest, some sort of procedural due process is necessary. See id. at 753-54. When deciding what process is due, a court must consider "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." Id. at 754; Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

In this case, Gary and Melissa's Fourteenth Amendment allegations mirror their Fourth Amendment allegations—their children were seized without a court order or exigent circumstances. The Second, Ninth, and Eleventh Circuits have equated the procedures required under the Fourteenth Amendment with those required under the Fourth Amendment for searches and seizures related to child abuse investigations. Doe, 329 F.3d at 1299 (denying Fourth Amendment claim "[f]or the same reason[]" it denied a due process claim); Wallis v. Spencer, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000) (noting that "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children"); Tenenbaum, 193 F.3d at 605 ("Whatever Fourth Amendment analysis is employed, then, it results in a test for present purposes similar to the procedural due-process standard.").

We see no reason to deviate from what these circuits have done. The procedures required for a constitutional search and seizure under the Fourth

Amendment are adequate to protect Gary and Melissa's procedural due process rights and liberty interest in directing the upbringing of their children. Texas law calls for a hearing as soon as possible after children are removed without a court order, TEX. FAM. CODE ANN. § 262.105, and that is what the defendants did in this case. Therefore, adequate procedural due process was given. Consequently, because summary judgment is appropriate for Gary and Melissa's Fourth Amendment claims, it is also appropriate for their Fourteenth Amendment claims.

F.    Supervisory Liability

The Gateses next claim that Defendant-Appellee Thomas Chapmond ("Chapmond") and Defendant-Appellee Sheriff Milton Wright ("Wright") are liable as the heads of TDPRS and the Fort Bend Sheriff's Department, respectively, for constitutional violations. A supervisory official may be held liable under § 1983 only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury. Baker v. Putnal, 75 F.3d 190, 199 (5th Cir. 1996). Here, the Gateses do not contend that Chapmond or Wright had any personal involvement with the events at issue. Instead, the Gateses argue that Chapmond and Wright unconstitutionally failed to train their employees.

To succeed on a failure to train claim, a plaintiff must show that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005). In this instance, the evidence in this case suggests

two possible constitutional violations—the warrantless entry into the Gateses' house and the removal of Travis and Alexis from their schools.[24]

Turning first to Chapmond, the Gateses do not make mention of him in their briefing. Thus, we consider their claim against him waived. See Yohey v. Collins, 985 F.2d 222, 224-25 (5th Cir. 1993). Even if not waived, the Gateses have not set forth evidence that the TDPRS employees were improperly or inadequately trained or that Chapmond was personally responsible for any such inadequacies.

With respect to Wright, the Gateses contend that they were prevented from obtaining discovery about Wright and any training procedures by an order of the district court.[25] Regardless, summary judgment for Wright was appropriate for at least three reasons. First, there is no evidence of a causal connection between any training and the Fort Bend deputies' entry into the Gateses home. The Gateses were able to depose Carrillo, and he testified that he was trained not to enter a home if the occupant refused to grant consent and there was no warrant or exigency. Second, because the standard for entering a home for purposes of a child abuse investigation was not clearly established in February 2000, see Section IV.B. supra, Wright is entitled to qualified immunity for any alleged training deficiencies. Third, the removal of Travis and Alexis from their schools did not involve any Fort Bend deputies, so there is no possible liability on those claims. Therefore, despite any lack of discovery as to Wright, the facts demonstrate that he is entitled to summary judgment.

---

[24] Because the TDPRS employees and Fort Bend deputies did not violate the Constitution when seizing the Gates children in February 2000, there can be no liability for any alleged failure to train on proper seizure procedures.

[25] Although the Gateses do not identify which order of the court they are referring to, the district court did stay the case as to all Fort Bend defendants in September 2004.

G.    Governmental Liability

The Gateses have also sued TDPRS and Fort Bend as governmental entities that were allegedly responsible for the violation of the Gateses' rights. Although the individual defendants have been dismissed on the basis of qualified immunity, governmental entities are not entitled to qualified immunity. See Owen v. City of Independence, 445 U.S. 622, 657 (1980). Therefore, we must determine whether TDPRS and Fort Bend violated the Gateses' constitutional rights. Because there was no constitutional violation in seizing the Gates children from their home, the only violations at issue are the entry into the Gateses' house and the seizure of Travis and Alexis from their schools.

It is well established that governmental liability under § 1983 must be premised on a government policy or custom that causes the alleged constitutional deprivation. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A policy may be a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. Burge v. St. Tammany Parish, 336 F.3d 363, 369 (5th Cir. 2003). A custom is shown by evidence of a persistent, widespread practice of government officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents government policy. Id. The Gateses have not identified any officially adopted policy that they claim is unconstitutional; therefore, we look for a custom that is unconstitutional.

The Gateses claim that TDPRS has an unconstitutional practice of calling Fort Bend deputies in order to force their way in to the homes of those they are investigating and that Fort Bend is a willing participant in these constitutional violations. As evidence, the Gateses point to the testimony of several TDPRS employees that it is a common practice to call the police to assist them in

44

entering a house for purposes of investigating claims of child abuse. What is lacking, however, is any evidence that the Fort Bend deputies use unconstitutional methods to gain entry into the homes. While the presence of a police officer might encourage a parent to consent to entry, the presence of a police officer alone is not sufficient to invalidate any otherwise voluntary consent.

Also, the failure to obtain a court order prior to entering the home is not actionable. Although there was testimony from several TDPRS employees that they never obtain court orders before removing children from their homes, there was a lack of corresponding evidence that those prior entries and removals were not made on the basis of parental consent or exigent circumstances. Therefore, the only case in which we can say with certainty that a constitutional violation may have occurred is the present one—when the TDPRS employees and Fort Bend deputies allegedly entered the Gateses' home without consent. However, "[i]solated violations are not the persistent, often repeated constant violations that constitute custom and policy as required for municipal section 1983 liability." Campbell v. City of San Antonio, 43 F.3d 973, 977 (5th Cir. 1995) (internal quotation marks omitted). Because it is permissible in some circumstances to remove a child from his home without a court order, the Gateses needed to present evidence that the prior removals were not based on consent or exigency before an unconstitutional custom can be shown. Therefore, the Gateses have failed to present evidence of a policy or custom that caused their alleged constitutional deprivation with respect to the entry into their home.

The analysis regarding the seizure of Travis and Alexis from their schools is similar. The Gateses present no evidence that children were routinely or customarily removed from school in the absence of a court order or a reasonable belief of abuse. Thus, we are left with two instances of unconstitutional conduct. We conclude that this is not sufficient to support a finding that TDPRS

customarily and unconstitutionally seized children from their schools in order to interview them at a central location. Therefore, the Gateses' claim fails on this count as well.

H.    Remaining Claims

The Gateses' briefing on appeal also addresses a few of their other causes of action. First, the Gateses make claims under the Texas Constitution, specifically Article I, Sections 9 and 19, which correspond to the Fourth and Fourteenth Amendments of the United States Constitution, respectively. The individual defendants contend that official immunity precludes any liability under the Texas Constitution. Texas law provides that a governmental employee is entitled to official immunity for "(1) the performance of discretionary duties (2) that are within the scope of the employee's authority, (3) provided that the employee acts in good faith." Telthorster v. Tennell, 92 S.W.3d 457, 461 (Tex. 2002). Official immunity is analogous but not identical to qualified immunity under federal law. Ballantyne v. Champion Builders, Inc., 144 S.W.3d 417, 427 n.3 (Tex. 2004).

Although recognizing that section 9 (search and seizure) and the Fourth Amendment are the same in all material aspects, the Texas Court of Criminal Appeals has held that Supreme Court decisions regarding the Fourth Amendment are not necessarily binding on section 9. Heitman v. State, 815 S.W.2d 681, 682, 690 (Tex. Crim. App. 1991). But see Williams v. Kaufman County, 352 F.3d 994, 1017 (5th Cir. 2003) (noting that Texas courts have interpreted section 9 as being congruent with the Fourth Amendment). Therefore, it is possible that section 9 provides more protection to Texas citizens than the Fourth Amendment does. However, Texas courts have rejected claims that the protections of the Texas Constitution exceed those of the Fourth Amendment when no authority is argued or provided for such an interpretation. See Arnold v. State, 873 S.W.2d 27, 33 (Tex. Crim. App. 1993). Here, the Gateses

make no argument that the Texas Constitution should be given a more expansive interpretation than the Fourth Amendment. Thus, we have no reason to conclude that application of section 9 would lead to a different result in this case.

Similarly, Texas courts have historically equated section 19 (due process) with the Fourteenth Amendment, although declaring that they are not bound by Supreme Court decisions if they believe Texas's protections are broader. Wilson v. State, 825 S.W.2d 155, 162 (Tex. App.—Dallas 1992, pet. ref'd). Again, though, the Gateses have not argued that section 19 provides more protection than the Fourteenth Amendment, and we see no obvious reason that it should in this case. Therefore, given the nearly identical nature of the state and federal law claims, as well as the doctrines of qualified and official immunity, we conclude that summary judgment was appropriate on the Gateses' state law claims for the same reasons it was granted on the federal claims.

Next, the Gateses argue that the district court erred when it dismissed their claims for declaratory relief. According to their first amended complaint, the Gateses seek a declaration that "the policies, practices, and acts complained of herein are illegal and unconstitutional." The grant or denial of declaratory relief is reviewed for an abuse of discretion. United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co., 414 F.3d 558, 569 (5th Cir. 2005). Because the district court correctly granted summary judgment in this case, we find no abuse of discretion in its decision to deny declaratory relief.

The Gateses also seek an injunction to prevent TDPRS, Fort Bend, and their employees from entering the Gateses' home and searching or seizing their children without a court order, consent, or exigent circumstances. We review the denial of a permanent injunction for an abuse of discretion and any conclusions of law de novo. United States v. Sage Pharms., Inc., 210 F.3d 475, 477 (5th Cir. 2000). Again, because summary judgment was appropriate on the Gateses'

substantive claims, we conclude that the district court did not abuse its discretion in denying the Gateses' request for injunctive relief.

The remainder of the claims brought by the Gateses were not briefed on appeal, and thus have been waived. See Yohey, 985 F.2d at 224-25. This includes claims of intentional infliction of emotional distress, excessive force, assault and battery, privacy violations, and abuse of civil process. We, therefore, affirm the district court's grant of summary judgment on those claims.

## V. CONCLUSION

Although we are affirming summary judgment against the Gateses, we are not necessarily endorsing all of the practices of TDPRS and Fort Bend as carried out in this case. Affirmance is required because the law in this area was not clearly established, and the government's interest in stopping child abuse, along with the doctrine of qualified immunity, tips the balance in favor of TDPRS, Fort Bend, and all of the individual defendants. However, now that we have clearly established the law in this area, we expect that TDPRS, law enforcement agencies, and their agents and employees will abide by these constitutional rules and seek to involve the state courts, who act as neutral magistrates in these complicated matters, as early in the process as is practicable. In that way, the government may ensure that everyone's interests are considered, and the least amount of harm will come to the children the government seeks to protect, as well as to their parents.

For the foregoing reasons, we AFFIRM the judgment of the district court.

AFFIRMED.