# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 7, 2022

Lyle W. Cayce
Clerk

No. 21-50888

Megan Marie McMurry, *Individually and as next friend of* J.M.;
Adam Seth McMurry, *Individually and as next friend of* J.M.,

> *Plaintiffs—Appellees*,

*versus*

Kevin Brunner,

> *Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:20-CV-242

Before Higginbotham, Higginson, and Oldham, *Circuit Judges*.
Patrick E. Higginbotham, *Circuit Judge*:[*]

Officer Kevin Brunner removed a child from her home during a child endangerment investigation. The child and her parents sued Brunner, claiming the removal violated the child's Fourth Amendment rights and the parents' Fourteenth Amendment rights. Asserting qualified immunity,

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 21-50888

Brunner moved to dismiss. The district court denied Brunner's motion. We affirm.

## I.

In October 2018, Megan and Adam McMurry lived in a gated apartment complex in Midland, Texas with their daughter and son, J.M. and C.M. Ms. McMurry was a teacher at Abell Junior High School, part of the Midland Independent School District. Mr. McMurry served in the National Guard and was then deployed to Kuwait and Syria. J.M. was fourteen years old and homeschooled online and C.M. was twelve years old and attended AJHS at the time of the events of this case.

While Mr. McMurry was deployed, Ms. McMurry was away exploring teaching opportunities in Kuwait from October 25 to October 30, 2018; she arranged for her neighbors, Gabriel and Vanessa Vallejos, to look after J.M. and C.M., as they had done before when she was away. Ms. McMurry also arranged for coworkers to take C.M. to school.

The day after Ms. McMurry left, the school counselor scheduled to drive C.M. to school fell sick and asked an MISD police officer, Alexandra Weaver, if she could drive C.M. while Ms. McMurry was out of town. Weaver did not take C.M. to school, but the counselor got another AJHS faculty member to drive C.M. Meanwhile, Weaver opened an investigation into the children's welfare, and told her supervisor, Officer Kevin Brunner, of her conversation with the counselor. Brunner met in turn with other faculty members who, while confirming that Ms. McMurry was traveling, also told Brunner that neighbors were checking on the children.

Weaver meanwhile filed a complaint against Ms. McMurry with the Texas Department of Family and Protective Services (CPS). Brunner and Weaver then traveled to the McMurry apartment to conduct a welfare check on J.M. Brunner asked J.M. when Ms. Vallejos last checked on her and J.M.

said Ms. Vallejos had been over that morning.[1] The officers told J.M. that they would be taking her to another location. J.M. texted her father that the police were at the McMurry apartment.

The officers took J.M. to the apartment complex's conference room for further questioning and ordered J.M. not to respond to her father who repeatedly called and texted her. J.M. told an apartment complex staff member that she wanted to reach her father, but when the staff member told the officers this, Brunner refused to let J.M. call her father. Brunner called Ms. Vallejos and asked her to meet them at AJHS. Brunner and Weaver then took J.M. to the junior high school in the backseat of their police car. Ms. Vallejos called J.M., but Brunner told J.M. that she could not take the call.

At the school, Brunner placed J.M. in an office. The Vallejoses came and spoke to Brunner, stating that they had last seen the children the night before. The Vallejoses were then allowed to see J.M. and they Facetimed Mr. McMurry. That afternoon, CPS investigated the status of the children but found no neglect or unreasonable risk of harm and sent the children home with the Vallejoses.

Brunner nonetheless continued his investigation and filed probable cause affidavits on December 2 and 4, 2018, to obtain an arrest warrant for Ms. McMurry. In January 2020, a jury acquitted Ms. McMurry of the charges of abandoning or endangering her children.

After the acquittal, the McMurrys sued Brunner under 42 U.S.C. § 1983. J.M. asserted that Brunner violated her Fourth Amendment right to be free from unreasonable seizures. Mr. and Ms. McMurry asserted that

---

[1] Although Brunner later learned that Ms. Vallejos had not checked on J.M. since the prior evening, this was not known to him when removed J.M. from the apartment. Brunner acted under the belief that Ms. Vallejos last checked on J.M. that morning.

No. 21-50888

Brunner violated their rights to substantive and procedural due process under the Fourteenth Amendment by taking J.M. from their home. Brunner moved to dismiss, asserting qualified immunity.[2]

The district court concluded that Brunner was not entitled to qualified immunity as to J.M.'s Fourth Amendment claim and the McMurrys' Fourteenth Amendment procedural due process claims but found that qualified immunity protected Brunner from the McMurrys' substantive due process claim. Brunner timely appealed.

## II.

We review *de novo* the district court's denial of the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[3] To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[4] We accept all facts as pleaded and construe them in the light most favorable to the plaintiff.[5] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6]

## III.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[7]

---

[2] Brunner also raised a state statutory defense, which the district court denied. Brunner did not appeal the denial of his state statutory defense.

[3] *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).

[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[5] *Reed v. Goertz*, 995 F.3d 425, 429 (5th Cir. 2021) (internal quotation omitted).

[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[7] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation omitted).

No. 21-50888

When a defendant asserts qualified immunity at the motion to dismiss stage, a plaintiff must "have alleged facts sufficient to plausibly show that (1) the defendant's conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct."[8]

## A.

The removal of J.M. was an unreasonable seizure in violation of the Fourth Amendment as a reasonable fourteen-year-old would not have believed she was free to leave when an officer removed them from her home for questioning while instructing her not to respond to calls from her father.[9] At the time of this alleged constitutional violation, our precedent in *Gates v. Texas Dep't of Protective & Regul. Servs*[10] and *Wernecke v. Garcia*[11] had clearly established that an officer could not reasonably remove a child from their home absent a court order, parental consent, or exigent circumstances.

A right is clearly established if it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right at the time of the challenged conduct.[12] Brunner argues that Justice Kavanaugh's concurrence in *Caniglia v. Strom* undermines the clarity of the established law.[13] A single sentence from a justice's concurring opinion in 2021 does not erode the notice value of our precedent *at the time of the alleged*

---

[8] *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021).

[9] *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 271–77 (2011) (noting that a child's age must be considered in a *Miranda* custody analysis as children are more susceptible to outside pressure).

[10] 537 F.3d 404, 427–29 (5th Cir. 2008).

[11] 591 F.3d 386, 398 (5th Cir. 2009).

[12] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

[13] 141 S. Ct. 1596, 1605 (2021) (Kavanaugh, J., concurring).

No. 21-50888

*misconduct* three years earlier in 2018. Brunner was on notice to the clearly established right given *Gates* and *Wernecke*.

Brunner had no court order or parental consent; to the contrary, he prevented J.M. from communicating with her father. Brunner claims exigent circumstances justified the removal of J.M. But "[e]xigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger . . . if [s]he remains in h[er] home."[14] The mere possibility of danger arising in the future is not enough.[15] Accepting the facts as pleaded, we see no indication of any imminent danger to J.M. At the time of the seizure, J.M. was in her family's apartment in a gated complex with staff present and Brunner believed that Ms. Vallejos had checked on J.M. that very morning. Absent exigent circumstance, Brunner's removal of J.M. was an unreasonable seizure that violated her clearly established Fourth Amendment right.

**B.**

Brunner invokes the independent intermediary doctrine to argue that the grand jury's indictment of Ms. McMurry for a charge of abandoning or endangering a child establishes that his actions were reasonable. In his brief's statement of the issues, Brunner asserted that the actions of the magistrate and district attorney were also findings by independent intermediaries, but then failed to develop the argument, only focused on the grand jury, thus waiving any argument on appeal relating to the magistrate and district

---

[14] *Gates*, 537 F.3d at 429; *see also Roe v. Tex. Dep't Protective & Regul. Servs.*, 299 F.3d 395, 407 (5th Cir. 2002) (citing *Tenenbaum v. Williams*, 193 F.3d 581, 604–05 (2d Cir. 1999)) (holding exigent circumstances exist if there is reason to believe that life or limb is in immediate jeopardy).

[15] *See Gates*, 537 F.3d at 427 (citing *Tenenbaum*, 193 F.3d at 594).

No. 21-50888

attorney.[16] We address the independent intermediary doctrine only with regards to the grand jury.

Under the independent intermediary doctrine, a grand jury's indictment can shield an officer who violates the Fourth Amendment by breaking the causal chain, ratifying the reasonableness of the officer's actions.[17] To break the causal chain, all the facts must have been presented to the grand jury.[18] This doctrine applies even if the indictment occurred after the officer acts and even if no conviction ultimately occurs.[19] However, where misdirection of the independent intermediary "taints" its decision, the causal chain remains unbroken.[20]

Brunner's invocation of the independent intermediary doctrine is unavailing as his probable cause affidavit—presented to the grand jury—contained information that Brunner did not know when he removed J.M. The grand jury was presented with information obtained in an investigation that continued after Brunner removed J.M., namely how long it had actually been since Ms. Vallejos last checked on J.M.[21] And it is significant that the affidavit omitted the fact that Mr. McMurry was available and trying to communicate and Brunner knew this. Given the asymmetry of information presented to the grand jury and information known to Brunner at the time of the alleged

---

[16] *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

[17] *Taylor v. Gregg*, 36 F.3d 453, 456 (5th Cir. 1994), *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc).

[18] *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988).

[19] Buehler v. City of Austin/Austin Police Dep't, 824 F.3d 548, 554 (5th Cir. 2016).

[20] *Hand*, 838 F.2d at 1428.

[21] Brunner believed Ms. Vallejos had been to the apartment earlier that morning when she had only visited the prior evening.

No. 21-50888

misconduct, the indictment of Ms. McMurry did not ratify Brunner's actions as reasonable, a conclusion refuted with an acquittal by a fully informed jury. The independent intermediary doctrine does not apply.

## IV.

In child removal cases, the same misconduct that supports a child's Fourth Amendment claim can also support a parent's Fourteenth Amendment claim to their due process right to be free from interference with the care, custody, and management of their children.[22] The McMurry parents brought substantive and procedural due process claims against Brunner. The district court found that Brunner was entitled to qualified immunity as to the parents' substantive due process claim but not their procedural due process claim. Brunner appeals the denial.

In analyzing parents' Fourteenth Amendment claims arising from the removal a child, this Court has said that the same rule from *Gates* applies: "A child cannot be removed 'without a court order or exigent circumstances.'"[23] There was no court order, parental consent, or exigent circumstances to justify the removal of J.M. from the family apartment. Brunner's actions violated the parents' right to procedural due process under the Fourteenth Amendment, law that was clearly established as *Gates* placed officials "on notice that they violate procedural due process when they remove children without a court order or exigent circumstances."[24] Brunner

---

[22] *Romero v. Brown*, 937 F.3d 514, 521–23 (5th Cir. 2019).

[23] *Id.* at 521 (quoting *Gates*, 537 F.3d at 434).

[24] *Id.* at 523 (citing *Gates*, 537 F.3d at 434). Although *Romero* was published after the events at issue here, *Romero* concluded that *Gates* clearly established the law in 2008, a decade prior to Brunner's actions in 2018. Thus, the law with regards to the Fourteenth Amendment was clearly established at the time of the misconduct here.

No. 21-50888

was not entitled to qualified immunity as to the Fourteenth Amendment claims at the motion to dismiss stage.

## V.

We AFFIRM the district court's denial of Brunner's motion to dismiss on the basis of qualified immunity. Accepting the facts as pleaded, there was no justification for the actions of Brunner, which violated J.M.'s clearly established Fourth Amendment right and the McMurrys' Fourteenth Amendment rights to procedural due process. The law is clear, where an officer seeks to remove a child from their home, the officer must secure a court order, parental consent, or there must be exigent circumstances such that there is an imminent danger to the child.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment:

In my view, two things differentiate this case from so many other qualified-immunity appeals that we handle on a weekly basis. First, this case does not involve a split-second decision by an officer who was trying to protect the public from violence; rather, according to the complaint, the officer in this case executed a deliberate and premeditated vendetta on the McMurry family. And second, the officer in this case used his badge and gun to interfere with the McMurry's parental rights. Different parents might have different reactions to the decisions the McMurrys made. But qualified immunity provides no defense to an officer who so grossly misuses his governmental power to interpose himself between parents and their children.

I.

We are reviewing a motion-to-dismiss decision, so we must describe the facts as plaintiffs plausibly allege them, drawing every reasonable inference in their favor. *See Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020). At this stage, here's what we must accept as true:

At the time of the incident, Adam McMurry was serving in the Mississippi Army National Guard and was stationed abroad in Kuwait. Megan McMurry was a teacher at Midland Independent School District ("MISD"), specifically at Abell Junior High School ("AJHS") campus. They have two kids: JM (daughter) and CM (son). JM was 14 and CM was 12. JM was homeschooled through an online program; CM attended school at AJHS, which is the same place Mrs. McMurry taught. The McMurry family lived in a gated apartment complex in Midland, Texas.

Mrs. McMurry wanted to reunite her family. So in 2018, she applied for teaching positions in Kuwait. Later that year, she got an interview with an international school there. She then scheduled a trip to Kuwait for the interview that would last five days (from October 25 to October 30). During

the trip, JM and CM would stay in the family's apartment in Midland, Texas. Mrs. McMurry made arrangements with her "neighbors"—the Vallejos family—to take care of the kids. Mrs. McMurry also informed her colleagues at AJHS about her trip and arranged for coworkers to drive CM to and from school.

Defendants are Alexandra Weaver and Kevin Brunner. At the time of the incident, Weaver was a police officer for the school district and was stationed at AJHS. Brunner was Weaver's supervisor.

The series of unfortunate events started on October 26, one day into Mrs. McMurry's trip. At 8:00 a.m., the coworker who was supposed to take CM to school asked Officer Weaver to do so because the coworker was sick. An honest mistake. Who would've guessed that Weaver's reaction would be this: Weaver, after hearing that Mrs. McMurry was out of town through the weekend, called Brunner and started an investigation into Mrs. McMurry. Weaver and Brunner then talked to a couple of Mrs. McMurry's coworkers to confirm she was out of town through the weekend. Weaver called Texas Department of Family and Protective Services ("CPS").

Instead of investigating further, Weaver and Brunner decided to conduct a welfare check on JM at the McMurrys' apartment. (Weaver did not take CM to school; the coworker got another AJHS faculty member to drive CM to school.) The officers directed an employee of the apartment complex to knock on the door, while the officers hid behind him. JM opened the door and was startled to see police. Brunner asked JM when Mrs. Vallejos last checked on her, and JM said that Mrs. Vallejos had been over that morning.

Brunner then told JM that "they were going to take her somewhere else to talk to her and that she needed to go back inside to change into warmer clothing." JM began to cry but reluctantly complied with the officer's order.

Weaver then followed JM into the apartment and proceeded to search it. Weaver found nothing out of the ordinary during this unconstitutional search.

JM texted her father "Dad, I'm scared. The police are here." But Weaver and Brunner took JM to the apartment complex's conference room to ask JM some questions anyway. They even ordered JM not to respond to her father who had been repeatedly calling and texting her. After some questioning, Brunner and Weaver contacted CPS again. Then they put JM in the back of their police car and took her to AJHS. Mrs. Vallejos called JM, but Brunner told JM that she could not take the call. Brunner and Weaver contacted the Vallejos, and Mrs. Vallejos went to the school to talk to the officers.

In the afternoon, CPS arrived to investigate. The CPS investigator—who obviously understands these situations far better than Brunner or Weaver—then rebuked the officers' purported concerns. Specifically, CPS concluded that the "children's needs were being met, that Ms. McMurry had made appropriate child care arrangements for the children and for C.M.'s transportation to school in her absence, that the children were able to respond to emergencies, that they faced no unreasonable risk of harm, and that there was no finding of abuse or neglect." CPS then let the children "leave with Ms. Vallejos to return to their home."

You might reasonably think that would be the end of the matter. Brunner and Weaver had snatched a fourteen-year-old girl from her home, held her incommunicado, searched her apartment without any form of suspicion or cause, and held her in the back of a police car and in a school she did not attend. But after CPS arrived and rebuked the officers, *then* they would surely stop.

No. 21-50888

Wrong. Brunner pressed a criminal investigation of Mrs. McMurry for child abandonment and endangerment. This investigation resulted in two significant consequences. First, when Mrs. McMurry returned to Midland, the school district put her "on administrative leave without pay pending the outcome of the 'current investigation' of the abandonment of children complaint." She was later fired. She "has not worked as a teacher since October 2018." Second, on December 4, Brunner sought an arrest warrant. And he somehow got one. Two days later, Mrs. McMurry "turned herself into the Midland County Jail," and she stayed in jail "for 19 hours while the staff there completed the processing of her bail bond." She was eventually acquitted by a jury.

Thereafter, the McMurry family sued, bringing numerous claims. JM sued Weaver and Brunner for unlawfully seizing her. The parents sued Weaver for an unlawful search and sued both officers for violating the parents' substantive- and procedural-due-process rights. Mrs. McMurry sued Weaver for defamation and invasion of privacy.

The officers moved to dismiss all claims. The district court granted in part and denied in part. After the court's decision, four claims remained: (1) the parents' claim for unlawful search against Weaver; (2) JM's claim for unlawful seizure against both officers; (3) the parents' procedural-due-process claim against both officers; and (4) Mrs. McMurry's claim for invasion of privacy against Weaver. Only Brunner timely filed a notice for interlocutory appeal, so Weaver is not before us.

There are thus two claims on appeal. The first is JM's claim based on a violation of her Fourth Amendment rights as incorporated by the Fourteenth Amendment ("Fourth Amendment claim"). The second is JM's parents' claim based on a violation of their procedural-due-process rights under the Fourteenth Amendment ("Due Process claim"). We have

jurisdiction under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Our review is *de novo*. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).

## II.

I first (A) explain my understanding of qualified immunity, which differs somewhat from the majority's. I then (B) conclude that Brunner violated the parents' procedural-due-process rights under clearly established law. I then (C) conclude that Brunner violated JM's Fourth Amendment rights under clearly established law.

## A.

Qualified immunity includes two inquiries. The first question is whether the officials violated a constitutional right. *Jackson v. Gautreaux*, 3 F.4th 182, 186 (5th Cir. 2021). The second question is whether the right at issue was clearly established at the time of the alleged misconduct. *Ibid.* The second question has caused some confusion.

Clearly established law is all about fair notice. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (Qualified immunity's "focus is on whether the officer had fair notice that her conduct was unlawful."). For there to be fair notice, the clearly-established-law standard "requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). That is, the "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Ibid.* (quotation omitted). There are generally two different paths to show this: (1) an on-point case and (2) the obvious-case exception.

14

1.

Start with the on-point-case requirement. To show that the law is clearly established, the plaintiff must identify a Supreme Court decision before the time of the alleged misconduct that held there was a constitutional violation on fundamentally or materially similar facts.

There's a lot packed in there. So let's break that down. First, the on-point case must be a *Supreme Court* decision issued before the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ("[T]he court must decide whether the right at issue was 'clearly established' *at the time of defendant's alleged misconduct*." (emphasis added)). The Supreme Court has never held that circuit precedent can clearly establish the law. *See Wesby*, 138 S. Ct. at 591 n.8 ("We have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity."); *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) ("assuming that Circuit precedent can clearly establish law for purposes of § 1983"); *Nerio v. Evans*, 974 F.3d 571, 576 n.2 (5th Cir. 2020) ("Although we know the Supreme Court's decisions can clearly establish the law, the Supreme Court has never held that our decisions can do the same."). Until they do, I would not rely on circuit precedent to deny qualified immunity.

Second, the plaintiff must identify a Supreme Court case with fundamentally or materially similar facts. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("Although earlier cases involving *fundamentally similar facts* can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with *materially similar facts*." (emphases added) (quotation omitted)); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated

the Fourth Amendment."). Identification of such a case ensures that the rule has been defined with specificity.

Third, the "decision must at least hold there was some violation of the [relevant] Amendment." *Nerio*, 974 F.3d at 575; *see also City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021) (per curiam) ("Neither the panel majority nor the respondent has identified a single precedent finding a Fourth Amendment violation under similar circumstances. The officers were thus entitled to qualified immunity."); *White*, 137 S. Ct. at 552 ("The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment.").

It makes sense for the plaintiff to have to point to a *holding* because "[d]ictum is not law, and hence cannot be clearly established law." *Morrow*, 917 F.3d at 875; *see also United States v. Vargas-Soto*, 35 F.4th 979, 997 (5th Cir. 2022) (Dicta has "no binding force."); *Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019) (Thapar, J.) ("[O]nly holdings are binding, not dicta."). "And while officers are charged with knowing the results of [Supreme Court] cases . . . officers are not charged with memorizing every jot and tittle . . . writ[t]e[n] to explain them." *Morrow*, 917 F.3d at 875–76 (quotation omitted).

It also makes sense for that holding to be a constitutional *violation*. That's because the best way for a reasonable officer to understand a constitutional rule's contours is when it's applied to materially/fundamentally similar facts that result in a holding of a violation. It'd be difficult to say that facts are materially or fundamentally similar if the result in case *X* is no violation but the result in case *Y* is a violation. The difference in outcome shows that the facts are fundamentally/materially *different*, not similar.

In sum, to show that the law is clearly established, the plaintiff must identify a Supreme Court decision issued before the time of the alleged misconduct that held there was a constitutional violation on fundamentally or materially similar facts.

2.

The other path is the obvious-case exception. This exception has benefits but often-insurmountable burdens.

Benefits first. As best I understand it, the obvious-case exception excuses the on-point-case requirement. In other words, a plaintiff always must point to a Supreme Court decision issued before the time of the alleged misconduct holding a violation of the constitutional right with fundamentally or materially similar facts *unless* he satisfies the obvious-case exception. *See, e.g.*, *Rivas-Villegas*, 142 S. Ct. at 8 ("In an obvious case, these standards can clearly establish the answer, even without a body of relevant case law." (quotation omitted)); *Wesby*, 138 S. Ct. at 590 ("Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."); *Salazar v. Molina*, 37 F.4th 278, 285 (5th Cir. 2022) ("It's true *Hope* established that a plaintiff need not identify an on-point case to overcome qualified immunity when a violation is 'obvious.'"). The plaintiff may instead rely on "general statements of the law" from a Supreme Court decision to show that the officer had "fair and clear warning." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quotation omitted). Put another way, the plaintiff may rely on general statements to show that "the statutory or constitutional question [is] beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

But to get that benefit, the plaintiff must meet a heavy burden. The Supreme Court recently made clear that for the obvious-case exception,

No. 21-50888

there are two necessary conditions: (1) "particularly egregious facts" and (2) "no evidence" that the official's actions "were compelled by necessity or exigency." *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (per curiam); *cf. Kentucky v. King*, 563 U.S. 452 (2011) (explaining that reactions from police-created exigencies are not split-second decisions).[1]

### B.

Under the above framework, the McMurrys have shown that (1) Brunner violated their procedural-due-process rights and (2) this is such an obvious case, on egregious facts, involving no exigency beyond the one Brunner himself created, that Brunner had ample fair notice of his personal liability.

### 1.

Start with the violation. The Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The "standard analysis" is "two steps." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Ibid.* Both are obviously met here.

---

[1] Such a result makes sense. When an officer has to make a split-second reaction, the clearly-established-law standard is extra rigorous: "[T]he law must be *so* clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Morrow*, 917 F.3d at 876; *see also Gonzalez v. Trevino*, 42 F.4th 487, 507 (5th Cir. 2022) (Oldham, J., dissenting) (suggesting that officers who do not make split-second decisions "should not get the same qualified-immunity benefits that cops on the beat might get").

No. 21-50888

a.

The McMurrys obviously have a fundamental liberty interest. It's well-established that parents have a "fundamental right . . . to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). As Justice Alito put it: "In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2053 (2021) (Alito, J., concurring).[2] The

---

[2] *See also, e.g.*, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (discussing "the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." (quotation omitted)); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare their children for additional obligations." (quotation omitted)); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) ("Drawing on enduring American tradition, we have long recognized the rights of parents to direct the religious upbringing of their children." (quotation omitted)); *Michael H. v. Gerald D.*, 491 U.S. 110, 123–24 (1989) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." (quotation omitted)); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) ("Most of his dissent is devoted to the proposition that parents have traditionally had the power to control what their children hear and say. This is true enough."); *id.* at 834 (Thomas, J., dissenting) ("The history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children.").

Supreme Court has squarely held that age-old liberty interest is protected by the procedural guarantee of the Due Process Clause. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982).

Officer Brunner obviously deprived the McMurrys of their liberty interest. JM's parents ordered JM to continue her homeschooling (via online instruction) on October 26 (a weekday) while Mrs. McMurry was in Kuwait. By staying in the McMurrys' apartment during school hours, JM was following her parents' instruction. And while JM was in her parents' apartment acting lawfully, she was in her parents' custody. By removing JM from the apartment, Brunner forced JM to violate her parents' entirely lawful instruction and thus deprived the parents of their right to custody and control of their daughter. Even more, Brunner stopped JM's father from further directing his daughter when Brunner prevented JM from answering his calls for no conceivable reason. Prong one is thus easily satisfied.

b.

The McMurrys also did not receive the process they were due. In fact, they received *no* process whatsoever. No *ex parte* court order, no warrant, no notice, no hearing. Nothing. Surely, the McMurrys had a right to at least *some* predeprivation process before their child was snatched from their home.

The Supreme Court has repeatedly explained that "[t]he right to prior notice and a hearing is central to the Constitution's command of due process." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." (quotation omitted)). Admittedly, there are "some exceptions to the general rule requiring predeprivation notice and hearing, but only in extraordinary situations where some valid governmental interest

is at stake that justifies postponing the hearing until after the event." *James Daniel*, 510 U.S. at 53 (quotation omitted); *see also Gilbert v. Homar*, 520 U.S. 924, 930 (1997) ("This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause."). For this reason, the Supreme Court has held that "[u]nless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property." *James Daniel*, 510 U.S. at 62; *see also Connecticut v. Doehr*, 501 U.S. 1, 18 (1991) ("[B]y failing to provide a preattachment hearing without at least requiring a showing of some exigent circumstance, clearly falls short of the demands of due process.").[3]

If predeprivation process is required for property unless there is an exigency, then the liberty interest here requires at least the same, if not more. After all, a "parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest *far more precious than any property right*." *Santosky*, 455 U.S. at 758–59 (emphasis added) (quotation omitted); *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981) ("This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to the companionship, care, custody and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." (quotation omitted)). Therefore, unless Brunner establishes an exigency, the McMurrys' procedural-due-process rights were violated.

---

[3] Brunner did not get a court order of any kind, so I need not discuss whether an *ex parte* court order is sufficient process. The only question is whether the McMurrys had a right to any process.

Brunner cannot come close to establishing such an exigency. The mere fact a 14-year-old is home alone cannot possibly justify immediately removing the teenager from the home. At the time Brunner seized JM, he knew JM had been without adult supervision for less than a day. JM answered the door, squelching any concern that she was already seriously injured. And nothing from JM's appearance indicated that she was at risk of imminent injury.

Moreover, Brunner's colleague (Weaver) performed an unlawful search of the apartment and found nothing indicating that JM was in any danger—let alone imminent danger. If it was really Brunner's "decision to prioritize the confirmation of [JM's] safety over the continuance of the investigation," as he claims, then at least at that point, Brunner received the very confirmation he prioritized. Instead, he continued to deprive the McMurrys of their liberty interest without justification. For example, after receiving the confirmation, Brunner took JM to AJHS, even though by his own admission, he did so in substantial part for *his own* "convenience" and to solve a "logistical problem." **Blue Br. 8** (quoting **ROA.76 ¶ 33**); **ROA.508; Blue Br. 29**.

Brunner in his brief tries to smuggle in safety concerns he obviously didn't have. To begin with, seven of Brunner's eight purported reasons for seizing JM were not even facially exigent. And the eighth purported reason does not pass the straight-face test: Brunner feigns concern that JM was at risk of "self-harm" because JM was crying and was worried her mother was in trouble. *See* **Blue Br. 30**. Besides the briefing, there is nothing in the record to suggest Brunner had this concern—let alone that he had it before he made the decision to remove JM from the apartment. He offers no reason to think JM would commit "self-harm" simply because she was crying. He offers no connection between his purported concern about "self-harm" to JM's mother. Plus, if Brunner really thought JM was considering "self-harm"

because of her *mother*, he would've let JM talk to her *father*—who was repeatedly calling and texting her. And never mind that all of the fourteen-year-old's tears were created by Brunner's heavy-handedness.

In short, Brunner did precisely what the Supreme Court has forbade: "[T]he Due Process Clause does not permit a State [or one of its officers] to infringe on the fundamental right of parents to make child rearing decisions *simply because a state judge [or officer] believes a better decision could be made*." *Troxel*, 530 U.S. at 72–73 (emphasis added). Brunner simply thought his idea was better than the one the parents made. Prong two is thus met.

### 2.

Next, clearly established law. The Supreme Court has not decided many cases on parents' rights to procedural due process. And I see none finding a violation on materially similar facts. So the McMurrys must show that this is an obvious case to pass prong two. They do.

First, as explained above, there's *no* evidence of necessity or exigency compelling Brunner to make a split-second reaction. *See supra*, at 7. No officer could reasonably have believed that JM was at risk of serious injury any time in the near future. And obviously, neither Brunner himself nor any member of the public faced any danger whatsoever.

Second, the facts here are particularly egregious. Weaver performed an illegal search in front of her supervisor (Brunner). And instead of settling for one constitutional violation (the search), Brunner went on to commit two more (unlawfully seizing JM and violating the McMurrys' due-process rights). And after taking custody of JM, Brunner prevented JM from talking to her father and the Vallejos for a significant amount of time. All while JM was crying and confused. Then CPS told Brunner that his safety concerns were baseless. And *still*, inexplicably, Brunner persisted and pushed for criminal charges against Mrs. McMurry. Like CPS, a jury of Mrs.

McMurry's peers squarely rejected Brunner's charges. But the damage was already done: Mrs. McMurry was already fired, was already prevented from teaching again, and had already spent 19 hours in jail.

Finally, the constitutional question is beyond debate. The Supreme Court has clearly held that for property, the Due Process Clause requires predeprivation process unless there is an exigency. The Court has also clearly held that a parent's liberty interest is far greater than any ordinary property interest. There was no exigency beyond the one Brunner created on his own. So it's beyond debate that the Due Process Clause required some predeprivation process here, and the McMurrys got none.

## C.

Finally, JM's Fourth Amendment claim. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (incorporating the Fourth Amendment against the States). Under clearly established law, Brunner violated JM's Fourth Amendment rights.

On appeal, all agree that Brunner seized JM the moment she opened the door. That's when Brunner ordered JM to put on warmer clothes, Brunner declared that he was going to take her elsewhere for questioning, and JM began complying with Brunner's order. And all agree that unless there were exigent circumstances, that seizure was unreasonable.

There's no evidence of exigent circumstances to justify Brunner's seizure of JM. Brunner claims that there were exigent circumstances because (1) it was reasonable to believe that JM was in danger of serious injury and (2) it was reasonable to act when he did. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such

injury. . . . Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). Even assuming it was reasonable for Brunner to believe JM was at risk of serious injury when he arrived at the apartment complex, it was obviously unreasonable for him to seize JM when he did. Brunner seized JM the moment she opened the door. He did not ask JM any questions before the seizure. For a seizure of JM to be reasonable at that moment, there'd have to be some evidence to show, not just a risk of danger, but an *imminent* risk. And for the same reasons above, Brunner cannot come even close to showing an imminent risk. *See supra*, at 7.

The law is also clearly established under the obvious-case exception. There's no evidence of exigency, the facts are particularly egregious, and the law is beyond debate. *See supra*, at 7, 10–11.[4]

For these reasons, I concur in the judgment rejecting Brunner's qualified-immunity defense.

---

[4] The independent-intermediary doctrine also provides no help to Brunner. Under that doctrine, "the chain of causation between the officer's conduct and the unlawful arrest 'is broken only where *all the facts* are presented to the grand jury, or other independent intermediary where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary.'" *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) (quoting *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 554 (5th Cir. 2016)). It beggars belief that Brunner could demand child abandonment and endangerment charges while omitting the facts that (1) Mr. McMurry was available and eagerly trying to reach his daughter and (2) *Brunner himself* was the one who prevented McMurry from doing so.